No. 93-413

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994

STATE OF MONTANA,

     Plaintiff and Respondent,

  v.

ROBERT TERRANCE WILD,

     Defendant and Appellant.

FILED

SEP 15 1994

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:  District Court of the Third Judicial District,
In and for the County of Powell,
The Honorable Ted L. Mizner, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        William F. Hooks, Appellate Defender Officer,
Helena, Montana

        John C. Schulte, Missoula, Montana

    For Respondent:

        Honorable Joseph P. Mazurek, Attorney General;
John P. Connor, Jr., Special Prosector;
Elizabeth Griffing, Assistant Attorney General;
Helena, Montana

        Chris Miller, Powell County Attorney, Deer
Lodge, Montana

Submitted on Briefs:  June 30, 1994

Decided:  September 15, 1994

Filed:

_____
Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

Robert Wild was convicted of burglary, two counts of kidnapping, and five counts of deliberate homicide in a jury trial in the District Court for the Third Judicial District, Powell County. He appeals. We affirm.

The issues are:

1. Did the District Court err in denying Wild's motion to suppress the statement he made to Agent McKay?

2. Did the court err in informing the potential jurors at voir dire that the death penalty would not be imposed in this case?

3. Did the court err in denying the motion to dismiss the felony murder homicide charges on grounds that the State failed to prove the necessary causal connection between the burglary and the subsequent deaths?

4. Did the court err in denying Wild's motion to dismiss on grounds that the State failed to preserve evidence?

5. Did the court err in admitting into evidence autopsy photographs of the five deceased inmates?

On September 22, 1991, nine inmates in the maximum security unit at the Montana State Prison cut their way through wire fences in the exercise yard and stormed the guards' control cages in the building. Robert Wild was one of those inmates. Eventually, the inmates gained access to and control of the entire maximum security unit, including cellblock D, where inmates in protective custody (PC) were housed for their own safety from other inmates.

2

By the time corrections officers regained control of the building four hours later, five PC inmates had been beaten, stabbed, and asphyxiated to death. Two more PC inmates survived by barricading themselves inside a laundry room. Five unarmed correctional officers took refuge during the riot inside a three-foot by five-foot shower room. They were not physically injured.

The information filed against Wild charged him with aiding, abetting, or attempting to aid other inmates in kidnapping the correctional officers by restraining them with threats of physical force in the cellblock C shower room. The second count of kidnapping alleged that Wild aided, abetted, or attempted to aid other inmates in kidnapping the two PC inmates by restraining them in the laundry room with threats of physical force. The burglary charge alleged that Wild knowingly entered or remained unlawfully in an occupied structure, cellblock D of the maximum security unit, with the purpose to commit an offense therein, namely riot. The five counts of deliberate homicide alleged that during the burglary, Wild or other persons legally accountable for the burglary caused the death of each of the five PC inmates who were killed.

Wild was found guilty of all of the above crimes after a five-day jury trial. He now appeals on five grounds.

Issue 1

Did the District Court err in denying Wild's motion to suppress the statement he made to Agent McKay?

3

An analysis of the voluntariness of a confession is a factual question which must take into account the totality of the circumstances. State v. Mayes (1992), 251 Mont. 358, 376, 825 P.2d 1196, 1208. Our standard of review is whether the District Court's findings are clearly erroneous. State v. Bower (1992), 254 Mont. 1, 7, 833 P.2d 1106, 1110.

Immediately after correctional officers regained control of the maximum security unit at the prison, state investigator Ward McKay began conducting individual interviews with the surviving prisoners who had been housed in that unit and the correctional officers on duty just before the riot. McKay spoke with Wild on September 24, 1991.

In his statement to McKay, Wild admitted being in on the planning of the September 22 incident for quite some time beforehand. He said, "I know I'm going to be charged with something." McKay's notes indicate that Wild said he watched the phones and the front gate during the riot and that he did some damage to offices, but that he did not go onto cellblock D. (No less than six inmates contradicted this statement at trial, testifying that they observed Wild on cellblock D during the riot.) In his statement to McKay, Wild said that he "didn't give a fuck what was going on in D block," and that the "fucking child molesters deserved to die." He also admitted to threatening the guards in the shower that he would "burn them out" if they did not give him the keys to the exercise yard.

4

Wild moved to suppress evidence concerning his statement to McKay on grounds that the statement was involuntary because of the coercive nature of the situation. He submitted an affidavit in which he professed that, at the time he was interviewed, he had not slept or eaten in forty-eight hours. In his affidavit, he stated that he was given no choice but to talk to the investigator and that he had no clothes but was just covered with a blanket. He related that he was frightened because he was being separated from the other inmates and he was afraid of being beaten by the guards. He also stated that, when he refused to speak to the investigator, he was threatened with the death penalty.

Wild did not testify in person at the hearing on the motion to suppress, relying solely on his affidavit. The State presented the testimony of Agent McKay and prison investigator Thomas Balaz, who was present when Wild was interviewed.

Agent McKay testified that, at the beginning of the interview, he immediately advised Wild in detail of his rights and told him that he was not under arrest and that he could ask to go back to his cell immediately. McKay testified that Wild said, "I know I can have an attorney present and I may want one, but I'll tell you when I do." McKay asked Wild what he could remember about September 22, 1991. Wild made a rambling narrative statement, with McKay asking few questions, but just listening and taking notes. Wild seemed excited and seemed to want to tell McKay certain things. Eventually, Wild said, "I know I'm going to be charged

5

with something, so I better have a lawyer." McKay testified that he then terminated the interview.

Agent McKay further testified that at the time he interviewed Wild, McKay had been eating the same food served to the inmates since the riot. He testified that they had been fed cold food such as rolls, fruit, juice, milk, sandwiches, and chips. He stated that Wild was wrapped in a blanket at the interview and that he could not see what, if anything, Wild was wearing under the blanket.

Thomas Balaz verified much of what Agent McKay said. He testified that Wild seemed excited but not frightened during the interview. He also testified that Agent McKay's demeanor was calm and quiet during the interview.

The court denied the motion to suppress, stating:

> It appears from the evidence presented that the statement--the defendant's statement was voluntarily given. The defendant was thoroughly advised of his rights and chose to speak to authorities, and when he determined to terminate the interview, the interrogation was stopped.

> It appears that the defendant has not offered any contrary evidence. The Court tends to discount the affidavit of the defendant when he is available to testify and has chosen not to do so, and did not subject himself to cross-examination on the issue.

We agree with the District Court. The affidavit of Wild, absent the opportunity for cross-examination, is not entitled to as much weight as the live testimony of McKay and Balaz.

> [T]he affidavit has to be accepted for what it actually is--a self-serving document drawn by [the defendant's]

6

> attorney. The general rule is that affidavits "are commonly regarded as weak evidence, to be received with caution," and that "they are not conclusive of the facts stated therein even though not contradicted by counter-affidavits." 32A C.J.S. Evidence § 1032 at 706.

Audit Services v. Kraus Constr., Inc. (1980), 189 Mont. 94, 103, 615 P.2d 183, 188.

Wild also points to an entry in the handwritten notes made by McKay during the interview: "Reg. [sic] Attny. - eventually." He asserts that this proves that his statement was involuntary. However, Agent McKay explained this notation in his testimony to the court. He stated he initially believed Wild was beginning to request an attorney at the outset of the interview, and began to write that down. It then became clear to him that Wild was not requesting an attorney at that time. McKay testified that when Wild eventually did assert his right to an attorney, the interview was terminated.

The totality of the circumstances as demonstrated in the evidence before the District Court reveals that Wild was informed of his rights and voluntarily waived them and that he was capable of understanding the meaning and consequences of his statements. The evidence further establishes that Wild made a narrative statement to McKay which was not extracted by detailed questioning.

We hold that the District Court did not err in denying Wild's motion to suppress the statement he made to Agent McKay.

## Issue 2

Did the court err in informing the potential jurors at voir dire that the death penalty would not be imposed in this case?

Each of the five deliberate homicide charges against Wild carried a potential punishment of death. However, before voir dire began, the presiding judge informed the jury panel:

> I would also advise you that this is not a capital case and the State is not seeking to have a death penalty imposed.

Wild argues that this violated the rule against informing a jury of the possible range of sentences available, citing State v. Herrera (1982), 197 Mont. 462, 643 P.2d 588.

In State v. Dawson (Ariz. App. 1989), 783 P.2d 1221, the Arizona Court of Appeals acknowledged that it is generally improper to inform a jury about the potential punishment a defendant faces upon conviction. Dawson, 783 P.2d at 1222. However, and noting that other courts have drawn the same conclusion, the Arizona court found no error, "fundamental or otherwise," in informing the jury that a defendant does not face the risk of a death sentence if convicted. The court recognized that a jury panel might include members disposed against capital punishment. It approved of the trial court's efforts to relieve the risk that jurors so disposed might be distracted in considering issues of guilt by the concern that, in the event of a guilty verdict, the death penalty might result. The appellate court agreed with the trial court's assessment that by advising the jury up front that the State is not

8

requesting the death penalty as punishment, a broader-based jury may be retained.

We agree with and adopt the reasoning of the Arizona court. Here, the District Court did not advise the jury panel what the potential range of sentences was; it simply told the panel this was not a death penalty case. Further, Wild has not established that he was prejudiced by the judge's statement. We hold that the District Court did not err by informing potential jurors the death penalty would not be imposed in this case.

## Issue 3

Did the court err in denying the motion to dismiss the felony murder homicide charges on grounds that the State failed to prove the necessary causal connection between the burglary and the subsequent deaths?

Wild maintains in his opening brief that the State failed to adequately prove a causal connection between the plan to enter cellblock D for the purpose of rioting and the deaths of the five inmates who were killed. He does not refer to, nor did the Court locate, any motion addressed to this subject at trial.

Wild's trial counsel made a general motion to dismiss at the close of the State's case for failure of the prosecution to prove its case beyond a reasonable doubt. However, that motion was not sufficient to apprise the District Court of the theory now raised or to allow the District Court an opportunity to rule upon this issue. Absent contemporaneous objection, this issue has not been

9

properly preserved for appeal and we will not consider it further. See State v. Losson (1993), 262 Mont. 342, 351, 865 P.2d 255, 260.

## Issue 4

Did the court err in denying Wild's motion to dismiss on grounds that the State failed to preserve evidence?

This issue addresses the failure of the State to preserve the clothing shed by the inmates when they were ordered to strip for a security search at the end of the riot. The issue was decided in State v. Gollehon (1993), 262 Mont. 293, 304-05, 864 P.2d 1257, 1264-65; and was further addressed in State v. Close (Mont. 1994), (Cause No. 93-370, Decided September 15, 1994). Wild concedes the issue is raised here only to preserve it for further proceedings.

We reaffirm our conclusions in Gollehon and Close. We hold that the District Court did not err in denying the motion to dismiss.

## Issue 5

Did the court err in admitting into evidence autopsy photographs of the five deceased inmates?

This Court ruled that the photographs at issue were admissible in Gollehon, 864 P.2d at 1263. This case is different, Wild maintains, because the medical examiner stated in response to cross-examination that he could present his testimony without the autopsy photos.

However, the medical examiner also testified in this case that the photos were necessarily instructive and essential in enabling

10

the jury to understand the nature of the injuries and that the photos simplified his task of explaining to the jury the injuries the victims had suffered. The photos were carefully selected as the best representations of the injuries sustained by the victims.

The autopsy photographs served, additionally, to corroborate testimony by inmates whose credibility was hotly contested at trial. Various inmates testified as witnesses for the State about different kinds of assaults which occurred upon the victims. We hold that the District Court did not abuse its discretion in balancing the probative value of the autopsy photographs against their prejudicial value, and in admitting them into evidence.

Affirmed.

_____
Chief Justice

We concur:

_____
_____
_____
_____
Justices

11

September 15, 1994

## CERTIFICATE OF SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:


Hon. Joseph P. Mazurek, Attorney General
Kathy Seeley, Assistant
215 N. Sanders, Justice Building
Helena, MT  59620

Hon. Ted L. Mizner
District Court Judge
409 Missouri Ave.
Deer Lodge, MT  59722

Chris Misser
Powell County Attorney
P. O. Box 805
Deer Lodge, MT  59722

John C. Schulte
Attorney at Law
111 North Higgins, Suite 502
Missoula, MT  59802

William F. Hooks
Appellate Defender Office
Capitol Station
P. O. Box 200145
Helena, MT  59620


ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY: _____
Deputy