15 P.3d 145 (2001)
142 Wash.2d 838
STATE of Washington, Respondent,
v.
Roy James TOWNSEND, a/k/a Roy Campbells Townsend, a/k/a David W. Rivera, a/k/a Roy J. Justiniano, Petitioner.
No. 68337-9.
Supreme Court of Washington, En Banc.
Argued May 18, 2000.
Decided January 4, 2001.
*146 Thomas Edward Doyle, Hansville, WA, for Petitioner.
David Brian St. Pierre, Assistant City Attorney, Bremerton, WA, for Respondent.
MADSEN, J.
Petitioner seeks review of a Court of Appeals decision affirming his first degree murder conviction and rejecting his contention that his trial counsel provided ineffective assistance of counsel when he failed to object to the oral instructions to the jury during voir dire that the present charges did not involve the death penalty. Additionally, the petitioner argues that the court erred when it found sufficient evidence to support premeditation. We hold that it is error to inform the jury during voir dire in a noncapital case that the case is not a death penalty case. However, under the facts of this case, we find the error harmless and affirm the Court of Appeals.

FACTS
On November, 1, 1996, Roy Townsend, Jack Jellison and the victim, Gerald Harkins, attended a party at Mike Brock's home. Several hours prior to the party, Brock mentioned to Townsend that he was angry at Harkins for spreading rumors about Brock's sister. After hearing the rumors, Townsend replied "either you can deal with it or I can deal with it." Verbatim Report of Proceedings (RP) at 95.
Brock suggested a hunting trip, at which time Brock would confront Harkins about the rumors. Brock later decided to not go hunting. Harkins, however, left the party in his pickup truck with Townsend and Jellison to go hunting. On the way, they stopped at Townsend's house where they picked up a spotlight and Townsend changed clothes. After the stop, Harkins drove while Townsend sat in the passenger seat, using a spotlight to search for deer and occasionally taking shots at road signs with his .45 caliber pistol.
Eventually, Harkins turned the truck onto a road which was blocked by a locked gate that prevented further access to the road. Townsend exited the vehicle and shot the lock several times but was unsuccessful in opening the gate. Townsend then got into the back of the pickup truck and Harkins turned the truck around. Later, Harkins turned onto a side road in another attempt to get up into the mountains. This road, too, was impassable, blocked by a large mound of dirt. As Harkins began backing up to go back down the hill, Jellison, then sitting in the passenger seat, heard a shot from the rear of the truck. Turning around, Jellison saw that Townsend had fallen out of the truck and lay on the ground many feet away from the truck. Townsend then asked "{a}re you guys okay?" RP at 127. Jellison replied that they were fine, but then Harkins slumped over his arm and Jellison realized that Harkins had been shot. Jellison jumped out of the truck and yelled to Townsend "[O] my God, you shot him. What the hell are you doing?" RP at 128. Townsend said that it was an accident.
Townsend asked if Harkins was still alive. Jellison noticed that Harkins was still breathing and that his eyes were open, staring at him. They argued about taking Harkins to the hospital but Townsend insisted that they could not do so since the police would never believe that the shooting was an accident. Jellison asked why the police would not believe them if it was an accident and Townsend reminded Jellison of their prior criminal histories.[1] Townsend then approached the driver's side of the truck, *147 looked inside, and raised the gun up to "the general area where the head was laying...." RP at 130. Townsend said "God forgive me," and pulled the trigger again. Id.
Townsend moved Harkins body over to the passenger seat and Jellison drove the truck back to the gate where Townsend dumped the body nearby in the dense woods. Jellison and Townsend drove back to Townsend's house and told Townsend's roommate, Mike Drury, that Harkins had been accidentally shot. Later, Townsend moved Harkins' truck and burned it. He took the gun with him to Yakima.
Several days after Harkins' death, Yakima police arrested Townsend for armed robbery and placed him in the Yakima County jail. While in custody, Townsend contacted Harkins' father and told him that he had information regarding his 18 year old son's death. In exchange for a promise of "help" with his armed robbery charges, Townsend provided substantial information, including the general location of Harkins' body.
The State charged Townsend with first degree murder, second degree murder, second degree arson, and first degree theft. At a pre trial hearing, and again during voir dire, there were references to the death penalty. The first discussion occurred during a motion in limine.
[PROSECUTOR]: Your Honor, I have one {motion in limine}. I think it's important and typically on first degree murder cases, the Court has done this in the past, that the Court inform the jury that this is not a death penalty case.
[COURT]: I will....
RP at 11.
Another reference to the death penalty occurred in the presence of the jury at the outset of voir dire.
[PROSECUTOR]: Alright. You understand this is a criminal case, a very serious criminal case. And I'll indicate to you right now ... I would ask the Court's indulgence. This is a first degree murder case. This case does not involve the death penalty. I think it's important that all the jurors understand that at this point in time.
THE COURT: Thank you ... I had intended to let the jury know that I'd forgotten to indicate because when you do hear the term first degree murder, a lot of people think automatically about a death penalty. This is not a case in which the death penalty is involved and will not be a consideration for the jury.
[PROSECUTOR]: Okay, so that concept of anxiety or anticipation is not involved in this particular case. Matter of fact, under the laws of the State of Washington, the only type of murder case that involves the death penalty is aggravated first degree murder. This is not an aggravated first degree murder. This is first degree murder.
Suppl. Partial Report of Proceedings at 2. Defense counsel did not object to any of the comments.
At the conclusion of trial, the jury found the petitioner guilty of first degree murder, second degree arson, and first degree theft. The trial judge imposed an exceptional sentence of 800 months, approximately one and one-half times the standard range. On appeal, the petitioner principally asserted that his counsel was ineffective when he failed to object to statements about the death penalty. The Court of Appeals, Division Two, found that the statements were not erroneous, rejecting a contrary holding in a recent case from Division One, State v. Murphy, 86 Wash.App. 667, 937 P.2d 1173 (1997), review denied, 134 Wash.2d 1002, 953 P.2d 95 (1998).[2] We accepted review to settle the conflict.

DISCUSSION
As a general rule, in any claim of ineffective assistance of counsel, the "[c]ourts engage in a strong presumption counsel's representation was effective." State v. McFarland, 127 Wash.2d 322, 335, 899 P.2d 1251 (1995); State v. Thomas, 109 Wash.2d *148 222, 225-26, 743 P.2d 816 (1987). "Competency of counsel is determined based upon the entire record below." McFarland, 127 Wash.2d at 335, 899 P.2d 1251. To establish ineffective assistance of counsel a defendant must prove deficient performance and resulting prejudice. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); In re Personal Restraint of Rice, 118 Wash.2d 876, 888, 828 P.2d 1086, cert. denied, 506 U.S. 958, 113 S.Ct. 421, 121 L.Ed.2d 344 (1992). To prove deficient performance, a defendant must demonstrate that the representation fell below an objective standard of reasonableness under professional norms and that there is a reasonable probability that, but for counsel's error, the result would have been different. Rice, 118 Wash.2d at 888-89, 828 P.2d 1086.
Under the first prong of the Strickland test, we begin by determining whether instructions to the jury regarding punishment is erroneous in a noncapital trial. Townsend argues that his trial counsel should have objected to the jury instructions because they were erroneous in citing Division One decision in State v. Murphy, 86 Wash.App. 667, 937 P.2d 1173 (1997), review denied, 134 Wash.2d 1002, 953 P.2d 95 (1998). In Murphy, the prosecution charged the defendant with first-degree and second-degree murder. During voir dire, the judge attempted to allay potential juror fears and added an additional instruction to the usual instruction found in Washington Pattern Jury Instructions: Criminal (WPIC) 1.02 (2d ed.1994).

I would advise you that this case does not involve a death penalty. You have nothing whatever to do, however, with any punishment that may be imposed in case of a violation of the law. The fact that punishment may follow conviction cannot be considered by you except insofar as it may tend to make you careful.
Id. at 669, 937 P.2d 1173; see WPIC 1.02.
On appeal, Murphy argued that since the jury is not to consider punishment, an instruction to the jury regarding the death penalty was error. Division One agreed. Acknowledging that other jurisdictions have allowed the jury to be informed that the death penalty is not involved in a case, see State ex rel. Schiff v. Madrid, 101 N.M. 153, 679 P.2d 821 (1984), the court nevertheless was persuaded that in Washington "punishment is irrelevant to the jury's task." Murphy, 86 Wash.App. 667, 670, 937 P.2d 1173 (citing State v. Todd, 78 Wash.2d 362, 474 P.2d 542 (1970)); State v. Forbes, 43 Wash. App. 793, 795, 719 P.2d 941 (1986). Relying on language from Todd, which held that when a judge places "undue emphasis" on certain factors, including sentencing considerations, the jury will most likely take them into account, the court concluded that the judge's instructions were erroneous. Todd, 78 Wash.2d at 376, 474 P.2d 542. Nevertheless the court upheld the verdict, finding the error harmless. Because the jury had found the defendant guilty only of the lesser charge, the court reasoned that the jury was not likely influenced by the death penalty instruction in reaching its verdict. Murphy, 86 Wash.App. at 673, 937 P.2d 1173.
Division Two in this case disagreed with Murphy, finding that the court's instruction was not error. The court reasoned:
{W}e believe that Murphy extends Todd too far in holding that the trial court is prohibited from simply advising prospective jurors that they will not be asked to deal with the death penalty. In our view, such a statement at the outset of voir dire in a first degree murder case does not place `undue emphasis' on sentencing considerations.
State v. Townsend, 97 Wash.App. 25, 31, 979 P.2d 453 (1999) (citing Todd, 78 Wash.2d at 376, 474 P.2d 542).
We might agree with Division Two if Todd were the only support for Division One's position. Todd involved the propriety of certain instructions in a death penalty case. Therefore, its discussion regarding "undue emphasis" on sentencing considerations is inapplicable here.
In Todd, the prosecution charged the defendant with capital murder. The defendant objected to an instruction which informed the jury that if it did not impose the death penalty the defendant would receive life imprisonment. The instruction went further and explained the parole process and that the *149 defendant could possibly be eligible for parole in thirteen and two-thirds years. See Todd, 78 Wash.2d at 373, 474 P.2d 542. The instructions did not explain in any detail the parole board determination process or how it selects inmates for release into the community. The court found this type of instruction dangerous since "it sets a standard where none has been set by the legislature and thus places undue emphasis upon one factor which the jury, whether or not it should do so, is bound to take into account." Id. at 376, 474 P.2d 542. The "undue emphasis" referred to in Todd involved a charged capital crime where the jury has an active part in determining whether the defendant should receive punishment by death.
While Todd is inapplicable, overwhelming authority supports the Murphy court's assertion that the jury in a noncapital case may not be informed about the penalty for the charged crime. The United States Supreme Court noted that "{i}t is well established that when a jury has no sentencing function, it should be admonished to `reach its verdict without regard to what sentence might be imposed.'" Shannon v. United States, 512 U.S. 573, 579, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994) (quoting Rogers v. United States, 422 U.S. 35, 40, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975)). The law of Washington holds the same: "The question of the sentence to be imposed by the court is never a proper issue for the jury's deliberation, except in capital cases." State v. Bowman, 57 Wash.2d 266, 271, 356 P.2d 999, 1002 (1960); see Todd, 78 Wash.2d at 375, 474 P.2d 542 ("[p]unishment is a question of legislative policy; the jury's function is to find the facts"); c.f. State v. Reece, 79 Wash.2d 453, 457, 486 P.2d 1088 (1971) ("rehabilitation is a vital concern of the state; it is not a concern of the jury while it ponders the sole question of guilt or innocence."). This is not a capital case, and the State provides no authority in Washington that allows the jury to hear about the potential punishment in a noncapital trial.
This strict prohibition against informing the jury of sentencing considerations ensures impartial juries and prevents unfair influence on a jury's deliberations. The only exception that allows juries to know about sentencing consequences is in a death penalty trial, and even then the jury is to consider the penalty only after a determination of guilt.
The State argues, however, that a failure to inform the jury that the death penalty is not involved will unfairly prejudice the prosecution since some jurors may always vote to acquit or opt out if they fear the death penalty may be involved. The converse could also be argued just as well: if jurors know that the death penalty is not involved, they may be less attentive during trial, less deliberative in their assessment of the evidence, and less inclined to hold out if they know that execution is not a possibility. Rather than giving jurors information about the penalty in a noncapital case, we believe that voir dire should be used to screen out jurors who would allow punishment to influence their determination of guilt or innocence and then, through instructions, jurors should be advised that they are to disregard punishment. This process should satisfy the concerns raised by the State. We see no reason to create an exception for noncapital murder cases.
Considering the long-standing rule that no mention may be made of sentencing in noncapital cases we conclude that counsel's failure to object to the instruction fell below prevailing professional norms.
The first prong of the Strickland test is not satisfied, however, if counsel's performance is the result of legitimate trial strategies or tactics. State v. McDonald, 138 Wash.2d 680, 697, 981 P.2d 443 (1999); McFarland, 127 Wash.2d at 336, 899 P.2d 1251. There was no possible advantage to be gained by defense counsel's failures to object to the comments regarding the death penalty. On the contrary, such instructions, if anything, would only increase the likelihood of a juror convicting the petitioner. Petitioner has carried his burden of establishing deficient performance. We next consider the second prong of the Strickland test: whether the error was prejudicial.
Under the second prong, a defendant must demonstrate that the deficient performance prejudiced the defense such that there is "a reasonable probability that, but for counsel's *150 unprofessional errors, the result of the proceeding would have been different." State v. Lord, 117 Wash.2d 829, 883-84, 822 P.2d 177 (1991) (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052). In Murphy, the court stated:
We are, however, persuaded that the erroneous instruction did not prejudicially affect the jury's deliberations in this case, only because the jury acquitted Murphy on the charge of first degree murder. The danger presented by the instruction was its tendency to influence deliberations on the first degree murder charge.
Murphy, 86 Wash.App. at 672-73. The petitioner reasons that since, unlike in Murphy, he was convicted of the greater of the two charges, prejudice is established.
Counsel's deficient performance is the failure to object to erroneous oral instructions to the jury. Under Washington law, when assessing the impact of an instructional error, reversal is automatic unless the error is "trivial, or formal, or merely academic, and was not prejudicial to the substantial rights of the party assigning it, and in no way affected the final outcome of the case." State v. Golladay, 78 Wash.2d 121, 139, 470 P.2d 191 (1970) (quoting State v. Britton, 27 Wash.2d 336, 341, 178 P.2d 341 (1947)); accord State v. Walden, 131 Wash.2d 469, 478, 932 P.2d 1237 (1997). Petitioner does not suggest that the jury would have acquitted him (nor does he challenge the arson and theft charges). Instead, the petitioner contends that the interference in the jury's deliberations led to his conviction of first degree murder rather than second degree murder.
Premeditation is "the deliberate formation of and reflection upon the intent to take a human life" and involves "the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short." State v. Gentry, 125 Wash.2d 570, 597-98, 888 P.2d 1105 (1995) (quoting State v. Ollens, 107 Wash.2d 848, 850, 733 P.2d 984 (1987)).
There was ample evidence of premeditation. Townsend brought a gun and had spoken with Mike Brock about "taking care of" Harkins. After shooting Harkins the first time, which may have been accidental, Jellison told Townsend that Harkins was still breathing and alive. Jellison recommended that they take Harkins to the hospital. Townsend declined, telling Jellison that no one would believe that the shooting was an accident since they both had criminal records. After that, Townsend went to the window of Harkin's truck, raised the pistol, said "God forgive me," and shot Harkins in the head, killing him. The evidence overwhelmingly supports a finding of premeditation.
Accordingly, counsel's failure to object to the statements informing the jury that this was not a capital case in no way affected the outcome. The petitioner has failed to show that he was prejudiced in any way. It follows that he has failed to satisfy the second prong of the Strickland test, which requires a showing of prejudice resulting from counsel's deficient performance.
The conviction is affirmed.
SMITH, JOHNSON, ALEXANDER, and SANDERS, JJ., concur.
IRELAND, J. (concurring).
While I agree with the majority's ultimate decision to affirm Roy Townsend's conviction, I disagree that the court erred or that the defendant's attorney was ineffective.
Because this case comes to us under an ineffective assistance of counsel claim, we need not address at length the issue of whether it is error to advise the jury of the death penalty's absence in a first degree murder case. Rather, under the traditional ineffective assistance analysis, we must determine whether Townsend's defense counsel's performance was deficient because he failed to object to the instruction, and if so, whether Townsend was sufficiently prejudiced thereby. State v. Lord, 117 Wash.2d 829, 883, 822 P.2d 177 (1991). Unlike the majority, however, I find that prejudice is not even an issue because defense counsel's performance was simply not deficient.
*151 Scrutiny of counsel's performance is highly deferential, and there is a strong presumption that defense counsel has adequately assisted his client. Lord, 117 Wash.2d at 883, 822 P.2d 177. In fact, to overcome this strong presumption of adequacy, a defendant must demonstrate that his or her attorney's errors were so egregious that the attorney was "not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Id. (quoting Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).
More specifically, to establish deficient performance based upon defense counsel's failure to object, the defendant must show, among other things, that the proposed objection would likely have been sustained. State v. Saunders, 91 Wash.App. 575, 578, 958 P.2d 364 (1998). Stated another way, a defendant must show that his trial counsel knew, or should have known, that the matter was objectionable. See id. Townsend cannot show such here.
At the time of Townsend's trial, State v. Murphy, 86 Wash.App. 667, 937 P.2d 1173 (1997), had not been decided. Murphy was not published until the last day of Townsend's triallong after defense counsel could have raised a meaningful objection based on that decision. Consequently, without direct precedent supporting an objection, Townsend cannot make the requisite showing that the objection would likely have been sustained. See Saunders, 91 Wash.App. at 578, 958 P.2d 364.
Furthermore, even if the timing of Murphy were not an issue, that decision misrepresents the law in Washington. Murphy erroneously relies on State v. Todd, 78 Wash.2d 362, 474 P.2d 542 (1970), to hold that it is error to inform a jury of the death penalty's absence from a case. Todd, however, does not proscribe any such thing.
Todd merely reiterates the long-standing, general rule that the jury's sole function is to decide the defendant's guilt or innocence, and that punishment should not be a consideration. Todd, 78 Wash.2d at 375, 474 P.2d 542. In Todd, the death penalty was involved, and the instruction in question detailed the sentencing possibilities facing a person convicted of first degree murder, including minimum sentence and parole provisions. Todd, 78 Wash.2d at 372-73, 474 P.2d 542. The court found that:
[T]he most serious vice of an instruction of this kind ... [was that it] places undue emphasis upon one factor which the jury, whether or not it should do so, is bound to take into account.... By instructing the jury concerning the possible minimum sentence which the defendant might serve, the court suggests to the jury that it should give great weight to that possibility in reaching its verdict.
Todd, 78 Wash.2d at 376, 474 P.2d 542.
Here, the death penalty was not involved, and merely advising the jury of that fact does not place "undue emphasis" on sentencing considerations. See Todd, 78 Wash.2d at 376, 474 P.2d 542. In fact, so advising the jury is likely to have the exact opposite effect. As the Court of Appeals aptly stated:
The prospect of applying the death penalty is a staggering responsibility that many prospective jurors would not welcome. As the trial judge noted, when ordinary citizens hear that someone is charged with first degree murder, they are likely to think of the death penalty. The challenged remarks had a benign purposeto ease jurors' anxiety that they might be asked to pronounce a death sentence.
. . . .
[Further, advising the jury of the death penalty's absence] should tend to quell the jury's natural speculation about the death penalty and, thus, to minimize the number of jurors seeking dismissal from jury service, thereby enhancing the array of potential jurors available to try the case.
Townsend, 97 Wash.App. at 30-31, 979 P.2d 453 (citing State ex rel. Schiff v. Madrid, 101 N.M. 153, 679 P.2d 821, 824 (1984)). The Court of Appeals' view, the view that I would have this court adopt, is supported by the majority of jurisdictions that have dealt with this issue. See People v. Hyde, 166 Cal. App.3d 463, 212 Cal.Rptr. 440, 450-51 *152 (1985).[1]
The majority also expresses its concern about where to draw the line between those cases that a court may instruct juries on the available penalties and those cases that it may not. This concern is misplaced. First, the court is not instructing the jury on the available penalties. Rather, it is simply informing the jury of what is unavailable.
Second, and more importantly, cases that may involve the death penalty are obviously different. See Burgess v. State, 444 N.E.2d 1193, 1195-96 (Ind.1983) (the death penalty is "unique and singular"). In first degree murder, a charge that naturally invokes thoughts of the death penalty, absent objection courts should be free to eliminate any improper speculations about the death penalty that could influence the voir dire process.
Townsend argues that juries will somehow become lax in their duties upon learning that the case is noncapital. It is simply untenable that upon learning that the death penalty is not involved, we can reasonably assume that a jury charged with the fate of a murder defendant will not exercise due diligence. See Hyde, 212 Cal.Rptr. at 451 ("[W]e think it impossible to contend that a jury charged with trying a murder defendant in a noncapital case is more likely to unfairly convict because of a diminished `sense of responsibility.' "). If such were the case, we would then have to assume that jurors would never give a case due consideration unless the death penalty were involved.
Perhaps Townsend believes he is "entitled to foster uncertainty with respect to potential penalties in hopes that one or more jurors conscientiously opposed to capital punishment will be unjustifiably swayed to acquit." Hyde, 212 Cal.Rptr. at 451.
However, a defense attorney may have a legitimate objection to discussing the absence of a death penalty before voir dire. A defense attorney (or even the prosecutor) may wish to inquire of jurors regarding the jurors' attitudes toward the death penalty. Such answers might help inform the attorney as to whether the juror would be acceptable.
Under such circumstances, the trial court should have discretion to rule after objection, as with other voir dire matters. Any claimed error by the court should be reviewed under an abuse of discretion standard.
In sum, while concurring in the result reached by the majority, I find no error in the trial court's instruction on the absence of the death penalty in this case. Such an instruction may be of value, as it may clear up any misconceptions and remove any thought of the death penalty from the process. The proper reading of Todd, the weight of foreign authority, and simple common sense should compel this court to reject the approach taken in Murphy and affirm the Court of Appeals' reasoning in Townsend.
GUY, C.J., TALMADGE, and BRIDGE, JJ., concur.
NOTES
[1] Townsend had prior adult convictions for burglary, possession of stolen property, unlawful possession of a firearm, and robbery. The trial court record reveals only that Jellison was convicted as an adult for "felony eluding."
[2] Murphy was published on June 9, 1997, which fell on the last day of Townsend's trial, which went from June 2 to June 9, 1997.
[1] As the California Court of Appeal stated in Hyde, 212 Cal.Rptr. at 450-51,

We believe the trial court's comments [regarding the death penalty's absence] were proper and prudent. The public commonly understands that in contrast to other criminal cases, the jury in a death penalty murder case must determine penalty as well as guilt. The moral and ethical questions surrounding the use of the death penalty have generated considerable social debate. It is reasonable to anticipate that a significant number of prospective jurors might question their ability to sit on a jury which potentially would have to consider imposition of a sentence of death. Not only did the trial judge's decision to raise and dispose of the issue at the outset save time and unnecessary strain on potential jurors' psyches, but it also avoided any possibility that a prospective juror's concern about serving on a death penalty case might skew his answers to voir dire questioning.
Accord State v. Mott, 187 Ariz. 536, 931 P.2d 1046, 1057 (1997); State v. Wild, 266 Mont. 331, 880 P.2d 840, 843-44 (1994); Stewart v. State, 254 Ga. 233, 326 S.E.2d 763, 764 (1985); Burgess v. State, 444 N.E.2d 1193, 1196 (Ind.1983). But see Commonwealth v. Smallwood, 379 Mass. 878, 401 N.E.2d 802, 805 (1980) (instructing jury of the death penalty's absence, "however ill-advised, [did not amount] to error of reversible magnitude.").