# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 72018-0-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JASON LEE BYRON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: January 25, 2016 |
| | ) | |

VERELLEN, A.C.J. — Jason Byron appeals his convictions for attempting to elude a pursuing police vehicle and possession of a stolen vehicle. He contends that his counsel was ineffective because she did not stipulate to the State's allegation that he was on community custody on the date of the charged offenses. But Byron expressly told his counsel that he wanted to compel the State to prove his community custody status. His counsel's decision to follow his instruction elevated the State's burden of proof on the issue to beyond a reasonable doubt. Given Byron's community corrections officer's (CCO) inability to recite when Byron's community custody period began, tolled, and recommenced, there was uncertainty whether his CCO had a factual basis to establish Byron's status on the date of the offenses. Even assuming deficient performance, the strong evidence connecting Byron to the crimes reveals no reasonable probability that the outcome would have been different. Accordingly, his claim of ineffective assistance fails, and we affirm.

## FACTS

Shortly after midnight on September 7, 2013, Washington State Patrol Trooper Anson Statema was parked on a park-and-ride access overpass. He observed Jason Byron drive a motorcycle onto the freeway southbound and accelerate rapidly. Trooper Statema visually estimated the motorcycle's speed at 75 to 80 miles per hour in a 60-mile-per-hour zone. Trooper Statema pursued. As Trooper Statema attempted to pull up alongside the motorcycle to observe its license plate, Byron suddenly accelerated to a speed of 120 miles per hour. After Byron moved to the right lane as though he intended to exit the freeway, Trooper Statema activated his emergency lights and siren.

Byron continued towards the exit. He took the off-ramp and drove over a curb into a grassy median area before sliding sideways on the grass and falling over. Byron stopped for a moment on his hands and knees in the grass, looked at Trooper Statema, and then began running southbound along the freeway ramp.

Trooper Statema observed that Byron was wearing blue jeans and black and white shoes. Trooper Statema initially did not pursue him on foot and stayed with the motorcycle. He watched Byron discard his motorcycle helmet down an embankment and continue to flee. Trooper Statema then drove to the other side of the freeway overpass, where he observed "a white male, with the same black and white shoes, and blue jeans, and a black T-shirt, but now without his helmet or jacket" climbing up onto the freeway ramp from an area thick with blackberry bushes.[1] Trooper Statema drove to another location on the overpass, where he saw "the same white male with short brown hair, wearing the black t-shirt, blue jeans, and black and white shoes, walking east from the

---

[1] Clerk's Papers (CP) at 58.

overpass."[2] Byron looked back to Trooper Statema's car, its emergency lights still activated, and started running quickly across the street, where he disappeared between two apartment buildings.

Additional Washington State Patrol troopers arrived shortly thereafter and set up a containment perimeter. Seattle Police Department officers also arrived and provided a police dog. The dog tracked the area from where Byron had discarded his helmet to an apartment building approximately one-and-a-half blocks away, where it located Byron lying down on a second-floor landing. He was sweating heavily, had grass seeds and leaves all over his shirt and face, and had dirt stains on his knees. The police placed him under arrest.

The motorcycle Byron had been driving had a partially filed-off vehicle identification number. The motorcycle's only other marking was an invalid motorcycle temporary tag affixed underneath the seat. The motorcycle was later identified by its true owner, who testified that it had been stolen from a parking lot in Seattle on June 17, 2013.

The State charged Byron with one count of attempting to elude a pursuing police vehicle and one count of possession of a stolen vehicle. The charging document also asserted that Byron was on community custody on the date of the charged offenses which, if proven, would result in an increase in his offender score by one point for each conviction.[3] The Snohomish County Public Defender's Office initially represented Byron, but on January 30, 2014, the day before his trial was set to begin, Byron hired private counsel.

---

[2] Id.
[3] RCW 9.94A.525(19).

3

During pretrial motions on the first day of trial on April 21, 2014, the prosecutor acknowledged that he had sat down with Byron's new counsel and explained to her the standard local practice of having the judge, rather than the jury, determine whether a defendant was on community custody at the time the present offenses were committed and that this fact was typically presented to the judge through an agreed stipulation. The prosecutor advised the trial court that it was Byron and his counsel's "decision to not stipulate to that."[4] Byron's counsel responded that she had "urged" Bryon to stipulate to his community custody status but that he had told her "no," "let them prove it."[5] Byron's counsel told the trial court "[i]t was his choice."[6]

Before any testimony was presented, the State offered defense counsel an opportunity to interview Byron's CCO. The interview occurred during a lunch recess. Before commencing with the CCO's testimony, the trial court granted defense counsel's request for an additional 10 minutes to further question the CCO. Following the recess, defense counsel moved to exclude the CCO's testimony, stating that the new information she learned from the CCO presented a question as to whether Byron "was, in fact, validly on community custody."[7] Defense counsel explained that because the CCO could not testify as to when Byron's community custody period began, tolled, or recommenced, that the CCO could not demonstrate how Byron's 18-month community custody period could last over several years.

---

[4] Report of Proceedings (Apr. 21, 2014) at 14.

[5] Id. at 18.

[6] Id.

[7] Id. at 54.

The trial court acknowledged that "it may well be that there is an issue" with the CCO's testimony and that there may be "some question with regard to the failure to have a chronology," but denied defense counsel's motion.[8] The court explained that defense counsel's issues with the CCO's testimony were "issues which cross-examination and contradiction, if necessary, are designed to deal with."[9]

The State's direct examination of the CCO was brief. The CCO testified that his job involved supervising people after they had been convicted of a crime. The CCO identified Byron in the courtroom and affirmatively stated that Byron was on community custody on September 7, 2013. The CCO further testified that Byron's community custody was originally supervised in Spokane, but transferred to Seattle after October 30, 2013 when Bryon moved to the area and was arrested for the September 7, 2013 offenses.

On cross-examination, the CCO testified that he could not remember the exact date on which Byron's 18-month community custody period started, but stated that it originated from a 2008 sentencing. The CCO explained that a defendant's community custody period tolls when a court issues an arrest warrant. As a result of Byron's seven community custody violations and subsequent arrest warrants, his community custody obligation had tolled seven times. The CCO further testified that most of Byron's community custody violations "took place because of his failure to report" to his CCO.[10] But the CCO could not testify as to when in between 2008 and 2013 Byron was actively supervised on community custody versus when his community custody period had tolled. The CCO acknowledged that he could have printed out those dates from the Department of Corrections' records but

---

[8] Id. at 54-55.

[9] Id.

[10] Id. at 69.

that he failed to do so. He also indicated that he may have met Byron over eight years ago when he reported to his office "maybe for a previous case."[11]

Jurors ultimately convicted Byron as charged, answering "yes" to the special verdict question regarding Byron's community custody status on the date of the offenses. With the additional point added onto each conviction for his community custody status, the trial court concluded that he had an offender score of 7 and imposed a total standard range sentence of 29 months.

Byron appeals.

## ANALYSIS

### Effective Assistance of Counsel

Byron contends that his counsel was ineffective because she made his community custody status an issue for the jury to consider. We disagree.

We review ineffective assistance claims de novo.[12] Both the state and federal constitutions guarantee criminal defendants the right to effective assistance of counsel.[13] To establish an ineffective assistance claim, a defendant must show deficient performance and resulting prejudice.[14]

Counsel's performance is deficient if it falls "below an objective standard of reasonableness."[15] To establish deficient performance, the defendant must show the

---

[11] Id. at 75.

[12] State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

[13] State v. Grier, 171 Wn.2d 17, 32 , 246 P.3d 1260 (2011).

[14] Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Nichols, 161 Wn.2d 1, 8, 162 P.3d 1122 (2007).

[15] State v. Townsend, 142 Wn.2d 838, 843-44, 15 P.3d 145 (2001).

absence of any "conceivable legitimate tactic" supporting counsel's action.[16] We strongly presume counsel's performance was reasonable.[17]

To establish prejudice, the defendant must show there is a reasonable probability that, but for the deficient performance, the outcome would have been different.[18] "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[19] Failure to establish either prong of the test is fatal to an ineffective assistance of counsel claim.[20]

Byron relies on State v. Jones[21] and State v. Wheeler[22] for the proposition that "the issue of community custody status under RCW 9.94A.525 is not part of the determination of guilt on the current offense to be proved to a jury beyond a reasonable doubt. Instead, it is a sentencing issue for the court to resolve by a preponderance of the evidence."[23]

In Jones, two defendants from separate cases argued that their Sixth Amendment right to a jury trial had been violated when their respective sentencing judges, "rather than a jury, determined that they were on community placement at the time of the present crime."[24] Our Supreme Court disagreed and concluded "that the United States Constitution *does not require* a jury to examine the record associated with a prior criminal

---

[16] State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004).

[17] Strickland, 466 U.S. at 689; State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

[18] Nichols, 161 Wn.2d at 8.

[19] Strickland, 466 U.S. at 694.

[20] Id. at 700.

[21] 159 Wn.2d 231, 149 P.3d 636 (2006).

[22] 145 Wn.2d 116, 34 P.2d 799 (2001).

[23] Appellant's Br. at 10.

[24] Jones, 159 Wn.2d at 235.

conviction to determine the defendant's community placement status."[25] Similarly, in Wheeler, our Supreme Court held that the State was not required to prove a defendant's prior convictions to a jury beyond a reasonable doubt in order for the defendant to be sentenced to life imprisonment without the possibility of parole.[26] There, as in Jones, the sentencing court did not offend state or federal constitutional law principles by making the community custody determination at sentencing by a preponderance of the evidence.[27]

Byron suggests he was disadvantaged by allowing the jury to become aware of his prior community custody. But, similar to the goals of the defendants in Jones and Wheeler, he was potentially benefited by requiring the State to prove additional facts to the jury beyond a reasonable doubt. Even though Byron has no constitutional right to force a jury to decide this issue beyond a reasonable doubt, that does not mean it could not benefit Byron to agree to this higher burden of proof on the State.

Here, Byron's counsel was expressly informed of the State's standard practice of stipulating to a defendant's community custody status so that the issue was "not inside the province of the jury."[28] Further, she advised Byron to stipulate. But Byron expressly communicated to her that he wanted to compel the State to prove his community custody status. And the court instructed the jury that in order to answer "yes" on the special verdict

---

[25] Id. at 239 (emphasis added), 241 ("Washington's sentencing courts must *be allowed* as a matter of law to determine not only the fact of a prior conviction but also those facts 'intimately related to [the] prior conviction' such as the defendant's community custody status." (emphasis added) (alteration in original) (quoting United States v. Moore, 401 F.3d 1220, 1225 (10th Cir. 2005))).

[26] Wheeler, 145 Wn.2d at 116.

[27] Id. at 121; Jones, 159 Wn.2d at 234.

[28] RP (Apr. 21, 2014) at 14.

form regarding Byron's community custody status on September 7, 2013, the jury had to "unanimously be satisfied beyond a reasonable doubt."[29]

Byron fails to demonstrate that his counsel's performance in following his decision not to stipulate "fell below an objective standard of reasonableness."[30] Here, the facts elicited during defense counsel's interview of the CCO prior to trial demonstrated that there was uncertainty whether Byron was on community custody on September 7, 2013, given the CCO's inability to recite when Byron's community custody period exactly began, tolled, and recommenced. Without those dates, it was not unreasonable for defense counsel to predict that a jury might have difficulty finding in favor of the community custody allegation beyond a reasonable doubt.

Still, Byron argues that he suffered prejudice because there is a reasonable probability that, "but for his counsel's error, the result of the trial would have been different."[31] He asserts the facts presented at trial "left room for reasonable doubt" to convict him of the charges and speculates that once the jurors learned about his "criminal history, which went back many years, and his repeated failure to abide by community custody conditions, they were more likely to conclude he committed the charged crimes because he was precisely the sort of individual who would engage in such conduct."[32] But because the mere allegation of prejudice is inadequate to prevail on an ineffective assistance of counsel claim, Byron's argument fails.[33]

---

[29] CP at 51.

[30] Townsend, 142 Wn.2d at 843-44.

[31] Appellant's Br. at 12.

[32] Id.

[33] See McFarland, 127 Wn.2d at 334, 337.

Byron must demonstrate a reasonable probability "based on the record" that the outcome would have been different.[34] There is no evidence in the record supporting Byron's claim. While the jury learned that Byron received 18 months of community custody from a previous sentencing, it was not made aware of any facts relating to that sentencing or any facts relating to his community custody violations other than that he was unable to maintain contact with his CCO.

Even assuming defense counsel's decision to follow Byron's instruction was deficient, Byron does not establish a reasonable probability that, but for this error, the outcome of his trial would have been different. Here, the majority of the driving portion of Byron's crime was captured on Trooper Statema's mounted dash camera and was admitted for the jury to see. Further, Trooper Statema testified that the police were able to successfully establish a containment zone around Byron and that, due to the efforts of a highly qualified police dog trained in tracking human scent and her highly qualified police handler, they were able to locate him nearby.

This dog track benefited from a "very clean start point" that involved no contamination from uninvolved parties.[35] The track also occurred during an early morning hour when there were no pedestrians nearby to offer distracting scents. The dog tracked straight from the motorcycle to the discarded helmet and ultimately tracked along the same path that Trooper Statema had observed Byron take. The police dog handler testified that his dog's performance in this case was "one of her most technically impressive to watch because she seemed to be focused the entire way, had no problems with the track."[36]

---

[34] Id. at 337.

[35] RP (Apr. 22, 2014) at 34.

[36] Id. at 40.

The dog tracked directly to Byron, who was found lying down on a second floor walkway of an apartment complex, sweating, with brush on his face and shirt and dirt stains on his knees. The jury received a photograph of Byron's appearance after he was caught. All of these details were consistent with Trooper Statema's testimony that he had observed Byron fall onto his hands and knees in the grass and run off in a direction that would have taken him through an area thick with blackberry bushes.

Because Byron fails to demonstrate that his and his counsel's decision to elevate the State's burden of proof on the issue of his community custody status prejudiced him, his claim of ineffective assistance of counsel fails.

Affirmed.

WE CONCUR: