208 P.3d 1221 (2009)
STATE of Washington, Respondent,
v.
Kristina Ranae GRIER, Appellant.
No. 36350-0-II.
Court of Appeals of Washington, Division 2.
June 2, 2009.
*1224 Casey Grannis, Nielsen Broman & Koch, PLLC, Seattle, WA, for Appellant.
Thomas Charles Roberts, Attorney at Law, Tacoma, WA, for Respondent.
HUNT, J.
¶ 1 Kristina Ranae Grier appeals her jury conviction and sentence for second degree murder.[1] In her Statement of Additional Grounds (SAG),[2] Grier argues that her trial counsel was ineffective in failing to explain and to request jury instructions on lesser included manslaughter offenses. At our request, the parties submitted supplemental briefs on this issue. Holding that defense counsel's failure to request lesser included offense instructions constituted ineffective assistance under the unusual circumstances of this case, we reverse and remand for a new trial.

FACTS

I. Substantive Facts
¶ 2 On the evening of February 21, 2006, several people were at Kristina R. Grier's house, including Gregory Owen, Michelle Starr (Owen's girlfriend), Owen and Starr's five-year-old daughter, Nathan Grier (Grier's 17-year-old son),[3] and Cynthia Michaels (Nathan's 17-year-old girlfriend).[4] Owen had recently been released from jail after having served a sentence for assaulting Starr and for violating a domestic violence restraining order that prohibited him from having any contact with her. While in jail, Owen had communicated with Starr through Nathan and Grier because he could not call Starr directly. Grier had several guns, two of which she apparently kept in her purse.[5] She also had a Winchester shotgun and a .22 old-fashioned rifle.
¶ 3 According to Michaels, at some point during the day, Nathan initiated a conversation with Grier about whether she could shoot a person. Grier was waving around one of her guns, pointed it at Nathan, and said that "she could shoot him if she wanted to." According to Michaels, this "was not really a threat." Nathan replied, "Go ahead and do it"; but Grier "put the gun away."
¶ 4 Starr took Grier to the store to purchase liquor. Starr asked Grier not to bring her guns, but Grier brought them anyway. According to Starr, Grier said she thought there were people living in her attic. Grier also told Starr that "[Grier's] boyfriend had sent somebody to rape her and that she had to confront the man with a 9 millimeter and that's how she ended up with the two guns."
¶ 5 After Starr and Grier returned from the liquor store, Owen and Michaels went to *1225 Fred Meyer to purchase pills to prevent hangovers. While Owen and Michaels were gone, Grier became upset because some cheese was missing. She yelled at Nathan about the cheese and then returned to her room "kind of crying loudly." According to Nathan, when Grier "drinks a lot, she gets emotional sometimes." When Owen returned, he went to Grier's bedroom to try to calm her down.
¶ 6 A few minutes later, Nathan also went back to Grier's bedroom. Grier showed Owen two nine millimeter guns, one black and one silver-and-black. Nathan asked Grier for money that she owed him from his Social Security check. Grier asked Nathan about the location of an ammunition clip for one of her guns, which clip Nathan had earlier misplaced.[6] Nathan remembered where the clip was and returned it to Grier, who then gave him the money she owed him. According to Nathan, Grier put both guns in her purse while they were all in the bedroom.
¶ 7 Grier, Owen, and Nathan left the bedroom and returned to the kitchen or dining room, where everyone sat around a table and drank alcohol. Grier began saying things that upset Nathan, such as that he "was not a good son, just kind of bringing up bad stuff [Nathan does]." Nathan told Grier to "shut up." According to Nathan, Owen slapped him in the mouth "kind of hard, you know. It's not like a friend slap when you are messing around."[7]
¶ 8 At some point, Starr left for her parents' house to borrow bedding so that she and Owen could spend the night at Grier's house. While Starr was gone, Grier began flirting with Owen. After Starr returned, Grier continued to flirt with Owen, which upset Starr. Starr suggested that they take the guns away from Grier. According to Nathan, Owen grabbed Grier's purse, put it under the table, and began removing things from the purse and "putting a couple of things in his pocket."
¶ 9 Later, Nathan took Grier to her room and put her to bed because she was "really drunk." After Grier was in her room, Owen began taking the bullets out of Grier's ammunition clips, asked which clip went with which gun, and said that he liked the silver-and-black gun. Nathan told Owen he could not take the gun because Grier would think Nathan had taken it and she would be mad at him.[8] According to Nathan, when Nathan tried to prevent Owen from taking the gun, Owen became angry.[9] Nathan told Owen he would have to leave because if Grier woke up and found her guns were gone, she would be angry.
¶ 10 Owen took Grier's gun out to his car along with some of the bedding that Starr had brought in earlier.[10] On the way to the car, Owen fired the gun at a neighbor's house. Grier heard the shot and began yelling from the bedroom, saying things like, "Do you mother-fuckers have my gun? He stole my gun." Nathan and Owen apparently persuaded her that the sound she had heard was something else.
¶ 11 Later, Owen and Starr fought about sex, during which Owen slapped Starr. At some point during this fight, Owen demanded from Nathan a phone number for a man that Owen thought had had sex with Starr while Owen was in jail. When Nathan said he did not have the phone number, Owen punched Nathan in the mouth, splitting Nathan's lip, which later required stitches, and causing Nathan to become "real dizzy." Michaels helped Nathan sit down in a chair.
*1226 ¶ 12 Grier reemerged from her bedroom with her purse and demanded to know where her guns were; she had put them in her purse and they were missing. According to Nathan, "She [Grier] seen me and him and he [Owen] was yelling at me, and I was bleeding everywhere. I had it all over my clothes." Grier told Owen to get off her son, and Owen pushed her. Nathan was not sure "if [Owen] slapped [Grier], you know, but he kept putting his hands on her and pushing her real hard."
¶ 13 Starr and Michaels took Starr's daughter and the rest of the bedding out to the car. Owen stole a portable DVD player from Nathan and put that in the car, too. Starr and Owen sat in the car talking for a while.
¶ 14 According to Nathan, the thought of Owen's taking Grier's guns frightened her. Grier asked Nathan if her shotgun was still in his closet or if Owen had taken that, too. Nathan replied that the shotgun was still in his closet. Grier removed the shotgun from the closet, looked to make sure it was not empty, and went outside. Nathan hid in one of the bedrooms, called 911, and "told them to get here because everyone has got guns." He whispered because Owen "hate[d] cop callers."
¶ 15 Apparently, when Grier came outside, Starr and Owen got out of the car. Grier cocked the shotgun, pointed it at Owen and Starr, and began yelling at them. Owen grabbed the barrel of the shotgun and struggled to take it away from Grier. Starr "got behind [Grier] and started choking her to the ground." Owen took the shotgun from Grier, but Grier "still had ahold of [Starr's] hair and wouldn't let go of [Starr]. So [Starr] had to hit [Grier's] head on the concrete for a couple of times to get [Grier] to let go of [her]." Owen put Grier's shotgun in his car. Hearing "a lot of yelling," Nathan went outside. Grier told Nathan that Owen and Starr had "beaten her up" and taken her guns. Nathan and Grier went back inside the house; Grier went back toward the bedroom.
¶ 16 Owen followed them inside Grier's house,[11] uninvited, yelling at Nathan and advancing toward him. According to Nathan, Grier came back into the living room, and said, "Get away from my son" and "get out of my house." At this point, Owen grabbed Grier. According to Nathan:
I didn't see a gun.
He [Owen] put his hands on her [Grier], pushed her again. And then she kind of grabbed on to him so she wouldn't fall, like pulling on him and, I think, checking his pockets, you know, trying to get her gun back. And he kept pushing her, you know, and then she tried to push him back and then he tried to push her away. And he was yelling at her a bunch of shit, like  I don't know. He was yelling.
. . . .
She was in front of me, and they were just yelling, and I was just kind of waiting for the cops, you know. And then I just heard a bang, and I looked up, and it looked like to me he [Owen] was, like, going back. And I didn't know.
At first I thought he [Owen] had the gun, you know, and was shooting it. And then I was . . . real scared, kind of in shock. And then she [Grier] was kind of trying to grab, you know, like his hands so he wouldn't do nothing, kind of like just grab on him, stop him if he was going to start shooting up everybody or something you know, get out of
I totally thought he [Owen] had the gun. That's what I told the cops because I was really scared.
RP (Vol. 2) at 165-66. Nathan believed that Grier was trying to protect him from Owen.
¶ 17 Michaels was in the house when Owen and Grier were struggling and Owen was shot, but she (Michaels) was not looking in their direction when the shooting happened. Michaels also saw Grier "pull on" Owen after the shot, but she (Michaels) did not see Grier with a gun. After the shot, Nathan ran out of the house and went to a neighbor's house to call the police again. Owen grabbed his chest, got up, and ran out of the house. *1227 Starr went after him.[12] Grier chased Starr to Starr's car, where the two of them had some sort of physical altercation.
¶ 18 Michaels intervened to help Starr, which resulted in a scuffle between Grier and Michaels. Grier said to Michaels "that she would[[13]] kill [her (Michaels)] and [she (Michaels)] was a bitch and a lot of things." Michaels ran back inside the house and locked the door. Grier broke a window to re-enter her house. Michaels grabbed her belongings, ran out the back door, joined Nathan in the neighbor's yard, and was with him when he called 911 again. Starr also called 911 and told them that "someone had been shot, because [she] didn't want them to think it was a personal feud between [Starr] and Greg . . . because of the no contact orders."
¶ 19 When the police arrived, they encountered Nathan, Michaels, and Starr outside and placed each of them in a separate police car. Eventually, they found Owen's body. Grier was still in the house, so the police went into SWAT mode. Grier barricaded herself in the house and did not communicate with the police. Four hours later, Grier came out of her house and was taken into custody.
¶ 20 Police found a silver-and-black pistol and a shotgun in Owen's and Starr's car. Police never found the gun that killed Owen.

II. Procedure
¶ 21 The State initially charged Grier with second degree murder, alleging that she was armed with a firearm at the time. The State later amended the information to add felony murder as an alternative means, with second degree assault as the underlying felony.

A. Jury Trial
¶ 22 Nathan, Michaels, and Starr testified for the State generally as relayed in the substantive facts section above. Grier objected to portions of their testimonies. Also testifying for the State were the responding and investigating officers and a 911-tape research analyst. Patricia Eddings, a trace analyst, testified that she found gunshot residue on a red sweatshirt that police had seized from Grier's hospital room. Dr. Alex Fox, an emergency room doctor, testified about treating Grier after she was arrested: He performed a urine drug screen on Grier, which was negative; a pregnancy test, which was also negative; and a blood alcohol test, which showed that Grier's blood alcohol level was .16.
¶ 23 Dr. Roberto Ramoso, the forensic pathologist who performed Owen's autopsy, testified that (1) Owen had died as a result of a gunshot wound to the chest; (2) the bullet had entered the victim's right upper shoulder and exited at a downward angle; (3) the gun could have been fired from 3 to 18 inches away from the victim; (4) he found no traces of soot deposit on the victim, a characteristic of close-range shots; but (5) he could not conclusively state that that the gun had been fired from more than 6 inches away because the victim's clothing could have filtered the soot. Dr. Ramoso did not testify about whether the wound could have been accidentally self-inflicted. On cross examination, Dr. Ramoso testified that Owen had a blood alcohol level of .16 and had marijuana in his system.
¶ 24 Terry Franklin, another forensic scientist, testified that (1) the silver-and-black gun found in Owen and Starr's car did not fire the bullet that killed Owen; and (2) the firing weapon used could have been a Hi-Point pistol. Rick Wade, the Lakewood Police Department's evidence supervisor, testified that the police found a Hi-Point firearm box in Grier's house. Detective Michael Zaro, a sergeant with the Lakewood Police Department who investigated the scene, testified about searching for the murder weapon: (1) In Grier's home, he found the bullet that killed Owen; (2) he believed it was possible that the weapon that shot the fatal bullet was a black Hi-Point pistol owned by *1228 Grier; and (3) he had searched for, but never found, the gun that killed Owen.
¶ 25 Grier called no witnesses. The trial court instructed the jury that "[h]omicide is justifiable when committed in the lawful defense of the slayer or the slayer's child" when certain requirements are met. Defense counsel initially requested instructions on the lesser included offenses of first and second degree manslaughter, but he later withdrew this request without explanation. Thus, the trial court gave no lesser included offense instructions and gave a "to convict" instruction for only second degree murder; the trial court also instructed the jury to answer the special verdict form affirmatively if it found beyond a reasonable doubt that Grier was armed with a firearm at the time of the commission of the crime.
¶ 26 In closing, Grier argued that (1) the State had not proved beyond a reasonable doubt that Grier fired the lethal shot because no one had seen her with a gun immediately before or after Owen was shot; (2) she did not have any guns left in her possession at the time Owen was shot; and (3) when Owen was shot, she had been acting in self defense and defense of her son, Nathan. Often, Grier argued the lack of evidence and self defense themes together, as illustrated in this excerpt:
They [the State] have to remove all reasonable doubts from your mind about whether [Grier] is the one that killed Greg Owen, that fired the shot. They have to remove from your mind any reasonable doubts about whether it was done to defend herself, any reasonable doubts about whether it was done to defend her son, and any reasonable doubts about whether it was done in resistance of a felony that was being committed in her presence. And I don't think there is much dispute, at the very least, about any felonies being committed in her presence.
RP (Vol. 8) at 957. Grier also hinted that Owen may have been shot accidentally during the struggle: "And then there is a struggle, and the gun goes off."
¶ 27 Yet at other points in her self-defense argument, Grier's argument is consistent with, though far from a concession, that she had fired the shot intentionally:
And what reasonable person is going to stand by and watch their son have this happen? You can say what you want about her mothering skills that night, but you tell me any mother, any reasonable mother, that's going to stand by and let some guy do this to their son and not act upon it. To suggest that somebody should not, a 17-year-old boy who is disabled? Ridiculous. There is no reasonable parent that is going to watch their child be assaulted like this more than once and not do something about it.
RP (Vol. 8) at 973. This argument is also consistent with Grier's having confronted Owen to fend him off without a weapon of any kind.
¶ 28 After a three-week trial, the jury found Grier guilty of second degree murder.[14] They also returned the special verdict form, finding that Grier had not been armed with a firearm when she murdered Owen.

B. Sentence
¶ 29 The trial court sentenced Grier to 220 months confinement to be followed by 24 to 48 months of community custody. As conditions of community custody, the trial court ordered Grier to undergo evaluation for treatment for substance abuse and mental health. Grier did not object to these conditions.

C. Appeal
¶ 30 Grier appealed both her conviction and the community custody conditions of her sentence. In her SAG, Grier wrote: "My attorney . . . didn't explain the option of offering to the jury the added instructions of manslaughter one and manslaughter two," an issue that neither counsel had addressed in their respective briefs. At oral argument on January 6, 2009, we ordered both counsel to file supplemental briefs addressing whether *1229 Grier's trial counsel's failure to have requested lesser included manslaughter instructions constituted ineffective assistance of counsel under the facts of this case. Counsel having filed their supplemental briefs, we now render our opinion.

ANALYSIS
¶ 31 In her SAG and in her supplemental brief, Grier argues that her trial counsel was ineffective in failing to ask the trial court to instruct the jury on the lesser included offenses of manslaughter in the first and second degrees. We find her argument persuasive, especially in light of (1) the sparse evidence of an intentional murder, including evidence suggesting that Owen, who had alcohol and drugs in his system, had taken Grier's gun and brought it back into her house when he confronted her; (2) the lack of evidence that Grier had the gun in her possession when Owen was shot; (3) the corresponding evidence supporting a reckless or negligent shooting during the struggle between Owen and Grier, perhaps in defense of self or of another; and (4) the jury's incongruous verdicts, especially the discrepancy between the second degree murder conviction and the jury's finding that Grier did not possess a firearm. Because we find this issue dispositive, we do not address Grier's other arguments.[15]

I. Standard of Review
¶ 32 We review an ineffective assistance of counsel claim de novo, based on the record below. State v. McFarland, 127 Wash.2d 322, 335, 899 P.2d 1251 (1995). We give great judicial deference to trial counsel's performance and begin our analysis with a strong presumption that counsel was effective. Strickland v. Washington, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Townsend, 142 Wash.2d 838, 843, 15 P.3d 145 (2001); McFarland, 127 Wash.2d at 335, 899 P.2d 1251. Only "a clear showing of incompetence" will overcome this presumption of effectiveness. State v. Varga, 151 Wash.2d 179, 199, 86 P.3d 139 (2004) (citing State v. Piche, 71 Wash.2d 583, 590-91, 430 P.2d 522 (1967), cert. denied, 390 U.S. 912, 88 S.Ct. 838, 19 L.Ed.2d 882 (1968)). We will not find ineffective assistance of counsel if the action complained of is a legitimate trial tactic, Varga, 151 Wash.2d at 199, 86 P.3d 139 (citing State v. Garrett, 124 Wash.2d 504, 520, 881 P.2d 185 (1994)), and does not fall below "`an objective standard of reasonableness based on consideration of all the circumstances.'" Garrett, 124 Wash.2d at 518, 881 P.2d 185 (quoting State v. Thomas, 109 Wash.2d 222, 226, 743 P.2d 816 (1987)). But where the trial tactic is unreasonable, we will reverse. As Division One noted in Ward:
In these circumstances, we can see no legitimate reason to fail to request a lesser included offense instruction. The all or nothing strategy exposed Ward to a substantial risk the jury would convict on the only option presented, two second degree assaults.
State v. Ward, 125 Wash.App. 243, 250, 104 P.3d 670 (2004). Such is the case here as well.

II. Ineffective Assistance of Counsel
¶ 33 To prove ineffective assistance of counsel, an appellant must show that (1) counsel's performance was deficient; and (2) this deficient performance prejudiced her. Thomas, 109 Wash.2d at 225-26, 743 P.2d 816 (quoting Strickland, 466 U.S. at 687, 104 S.Ct. 2052). To meet the first part of the ineffective assistance of counsel test, a defendant must demonstrate that counsel's actions fell below an objective standard of reasonableness. Townsend, 142 Wash.2d at 843-44, 15 P.3d 145; State v. Stenson, 132 Wash.2d 668, 705, 940 P.2d 1239 (1997), cert. denied, 523 U.S. 1008, 118 S.Ct. 1193, 140 L.Ed.2d 323 (1998). To demonstrate prejudice, the second part of the ineffective assistance of counsel test, a defendant must demonstrate a reasonable probability that the outcome *1230 would have been different absent the deficient performance. Townsend, 142 Wash.2d at 844, 15 P.3d 145; In re the Personal Restraint of Pirtle, 136 Wash.2d 467, 487, 965 P.2d 593 (1998). "Reasonable probability" means "sufficient to undermine the confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. Grier meets both prongs of the ineffective assistance of counsel test. We address each prong in turn.

A. Deficient Performance:

Failure to Request Lesser Included Manslaughter Instructions
¶ 34 Defense counsel's failure to request jury instructions for a lesser included offense may constitute constitutionally deficient performance in rare circumstances such as those presented here. See State v. Pittman, 134 Wash.App. 376, 166 P.3d 720 (2006); Ward, 125 Wash.App. 243, 104 P.3d 670. First, the record must demonstrate that Grier was entitled to manslaughter instructions under both the factual and legal prongs of the Workman test.[16]See Pittman, 134 Wash.App. at 384, 166 P.3d 720. Second, Grier must show that, under the facts of the case, it was an objectively unreasonable tactical decision for defense counsel to force the jury to find either that the greater offense occurred or that no offense occurred (the "all or nothing" tactic). See Pittman, 134 Wash. App. at 387, 166 P.3d 720.

1. Workman Test  Entitlement to Lesser Included Instructions
¶ 35 To demonstrate that Grier's counsel performed deficiently, the record must show that the facts entitled her to lesser included manslaughter instructions. Under the Workman test, a defendant is entitled to a lesser included offense instruction when (1) each of the elements of the lesser offense is a necessary element of the charged offense (the legal prong), and (2) the evidence supports an inference that only the lesser crime was committed (the factual prong). State v. Workman, 90 Wash.2d 443, 447-48, 584 P.2d 382 (1978).
¶ 36 Grier satisfies the legal prong of the Workman test because the elements of first and second degree manslaughter are necessary elements of intentional second degree murder. The elements of intentional second degree murder include: (1) causing the death of another, and (2) intent to cause death. RCW 9A.32.050; State v. Bowerman, 115 Wash.2d 794, 805, 802 P.2d 116 (1990). The elements of first degree manslaughter include: (1) causing the death of another, and (2) recklessness. RCW 9A.32.060; Bowerman, 115 Wash.2d at 806, 802 P.2d 116. The elements of second degree manslaughter include: (1) causing the death of another, and (2) criminal negligence. RCW 9A.32.070; Bowerman, 115 Wash.2d at 806, 802 P.2d 116. Causing the death of another is an express element of each of these three levels of homicide; the differences among these three degrees are their respective mental states, with corresponding lesser degrees of culpability. Both recklessness and criminal negligence are lesser included mental states of intent to cause death. RCW 9A.08.010(2).[17] Therefore, first and second degree manslaughter are necessarily proven when intentional second degree murder is proven.[18]State v. Berlin, 133 Wash.2d 541, 551, 947 P.2d 700 (1997) (holding that the elements of first and second degree manslaughter *1231 are necessarily proven when the elements of second degree murder are met for purposes of the Workman test).
¶ 37 Grier also satisfies the factual prong of the Workman test, based on Nathan Grier's testimony and the theory that Grier acted in self-defense but recklessly or negligently acted with excessive force in causing Owen's death. In deciding whether the record supports the inference that only the lesser included offense was committed, we review the record in the light most favorable to the party requesting the instruction, namely Grier. Ward, 125 Wash.App. at 248, 104 P.3d 670 (citing State v. Fernandez-Medina, 141 Wash.2d 448, 455-56, 6 P.3d 1150 (2000)). Nevertheless,
It is not enough that the jury might simply disbelieve the State's evidence. Instead, some evidence must be presented which affirmatively establishes the defendant's theory on the lesser included offense before an instruction will be given.
State v. Fowler, 114 Wash.2d 59, 67, 785 P.2d 808 (1990) (citing State v. Rodriguez, 48 Wash.App. 815, 820, 740 P.2d 904, review denied, 109 Wash.2d 1016 (1987)). Thus, there must be some affirmative evidence tending to show that Grier acted either recklessly or negligently, as opposed to intentionally, when Owen was shot.
¶ 38 Washington common law provides for a lesser included offense instruction when evidence demonstrates that the defendant acted with a reasonable belief that self-defense is necessary, but the defendant recklessly or negligently responded with excessive force. State v. Schaffer, 135 Wash.2d 355, 358, 957 P.2d 214 (1998). Under this theory, a defendant is entitled to manslaughter instructions when sufficient evidence demonstrates that the defendant, or another, was in reasonable danger but the defendant recklessly or negligently used lethal force to repel the danger. Id.[19]
¶ 39 A person acts "recklessly" when she "knows of and disregards a substantial risk that a wrongful act may occur and [her] disregard of such substantial risk is a gross deviation from conduct that a reasonable [person] would exercise in the same situation." RCW 9A.08.010(c). A person acts "negligently" when she "fails to be aware of a substantial risk that a wrongful act may occur and [her] failure to be aware of such substantial risk constitutes a gross deviation from the standard of care that a reasonable [person] would exercise in the same situation." RCW 9A.08.010(d).
¶ 40 Viewed in the light most favorable to Grier, Nathan's testimony presents affirmative evidence that Grier acted only recklessly or negligently, as opposed to intentionally, and thus committed only the lesser included offenses of manslaughter in the first or second degree. As in Schaffer, the record supports a conclusion that Grier acted with the reasonable belief of imminent harm to herself or to Nathan, but that she recklessly or negligently used excessive force. Earlier that evening, Owen had stolen two guns from Grier in her own home. Owen had also punched Nathan in the mouth, splitting his lip and causing him to bleed profusely. Minutes before the shooting, Grier had confronted Owen with a shotgun to try to retrieve her other guns, but Starr had wrestled Grier to the ground while Owen took *1232 Grier's shotgun away from her outside her home. The record strongly suggests that at this point, Grier did not have her pistol  and thus not the weapon that killed Owen  in her possession because Owen had taken her firearms.
¶ 41 It is undisputed that no one saw Grier with a gun immediately before, during, or after Owen was shot. On the contrary, the record shows that Owen had removed Grier's guns from her purse and placed at least one of them in his car; Nathan saw Owen hide one of Grier's guns underneath his (Owen's) sweater. Aided by Starr, Owen had just assaulted Grier, taken her shotgun, and put it in his car, too.
¶ 42 When Owen reentered Grier's home, uninvited, Grier knew that he had her shotgun and her pistol  a deadly weapon that is easy to conceal. Owen yelled at and approached Grier's son, Nathan, who was still bleeding profusely from Owen's earlier assault. When Grier came into the room, she told Owen to "[g]et away from [her] son" and to "[g]et out of [her] house," Owen turned his attention on her and started shoving her. This evidence supports Grier's reasonable belief that Owen meant to harm her, or perhaps her son again. Nathan originally believed that it was Owen who had brought the gun into the house and fired the shot, not Grier. Nathan saw only that Grier was wrestling with Owen and pulling at his sleeve, as if trying to grab a gun from him. At no time did Nathan see Grier with a gun in her hand. Moreover, the gun that inflicted Owen's mortal wound was never recovered.
¶ 43 The medical examiner's testimony showed that the fatal gunshot could have been fired from 3 inches to 18 inches away. The medical examiner did not testify either that the fatal shot could have been accidentally self-inflicted or that it was clearly inflicted by another. Nor was there testimony about the angle of the gunshot compared to the relative positions of Grier and Owen, the presence or absence of powder burns on Owen's chest or hands, etc. Although there was gunpowder residue on Grier's sweatshirt, there was no evidence of any gunpowder residue or powder burns on her hands.
¶ 44 We hold that Grier has met the Workman test: She has satisfied the legal prong because the elements of first and second degree manslaughter are included as necessary elements of second degree murder. Grier has also satisfied the factual prong because the evidence supports the inference that Grier committed only the lesser crime of first or second degree manslaughter. The record supports the defense theory that Grier reasonably felt it was necessary to defend herself as well as her son in some manner. But if she either wrestled a gun from Owen or somehow came into possession of a gun and shot him, the jury could have found that Grier recklessly or negligently responded with excessive force in fending off Owen's advancing assault; at that point Owen had shoved her and not displayed a weapon. But the record shows that Grier was well aware that Owen had very recently taken possession of her firearms; and she had heard the gunshot outside when Owen shot her gun at a neighbor's house before barging back into Grier's house. Thus, Grier was entitled to jury instructions on the lesser included manslaughter offenses.

2. "All or Nothing"  Not a Legitimate Trial Tactic Under Circumstances
¶ 45 Grier must also show that trial counsel's failure to request these lesser included manslaughter instructions (the "all or nothing" tactic) was an unreasonable tactic given the circumstances of her case. See In re the Personal Restraint of Davis, 152 Wash.2d 647, 673, 101 P.3d 1 (2004). The State argues that Grier received effective assistance of counsel because defense counsel made a tactical decision not to request the manslaughter instructions, as evidenced by counsel's having proposed and then withdrawn such instructions. The State is correct that generally, "[d]eficient performance is not shown by matters that go to trial strategy or tactics." State v. Hendrickson, 129 Wash.2d 61, 77-78, 917 P.2d 563 (1996); see also State v. McNeal, 145 Wash.2d 352, 362, 37 P.3d 280 (2002). And we acknowledge that we rarely, if ever, reverse where the record demonstrates legitimate trial strategy, including forcing the jury to choose between convicting of a high degree offense *1233 and acquittal, with no middle ground for a lesser included offense verdict.
¶ 46 Nevertheless, deliberate tactical choices may constitute ineffective assistance of counsel if they fall outside the wide range of professionally competent assistance. See Pittman, 134 Wash.App. at 390, 166 P.3d 720. Grier rebuts the presumption that counsel's representation was effective[20] because the record demonstrates that her counsel's choice to withdraw the lesser included instructions and not to request the trial court to give them was "unreasonable" and "not sound trial strategy"[21] under the unique facts of this case.
¶ 47 Courts have used three themes to gauge whether a tactical decision not to request a lesser included offense instruction is sound or legitimate: (1) The difference in maximum penalties between the greater and lesser offenses; (2) whether the defense's theory of the case is the same for both the greater and lesser offenses; and (3) the overall risk to the defendant, given the totality of the developments at trial. See Pittman, 134 Wash.App. at 387-88, 166 P.3d 720; Ward, 125 Wash.App. at 249-51, 104 P.3d 670. We address each theme in turn.

a. Significant difference between penalties
¶ 48 In Ward and Pittman, Division One of our court explained the significant difference in penalties for the charged crimes and the omitted lesser included offenses. Ward was charged and convicted of two counts of second degree assault, for which he faced 89 months incarceration, even though some evidence demonstrated that he was guilty of only unlawful display of a weapon, a gross misdemeanor, for which the maximum sentence was one year of incarceration. Ward, 125 Wash.App. at 247-49, 104 P.3d 670. Pittman was charged and convicted of attempted residential burglary, for which he faced 9 to 10 1/2 months in prison, even though some evidence tended to show that he was guilty of only attempted first degree criminal trespass, which carried a maximum sentence of 90 days in jail. Pittman, 134 Wash.App. at 380, 389, 166 P.3d 720. In both cases, the court explained that such a significant difference in penalties exposed the defendants to an unreasonably high risk. Id. at 388-90, 166 P.3d 720; Ward, 125 Wash.App. at 250-51, 104 P.3d 670. In both Pittman and Ward, Division One reversed and remanded for new trials, based on counsel's failure to request instructions on lesser included offenses. Pittman, 134 Wash.App. at 390, 166 P.3d 720; Ward, 125 Wash.App. at 250-51, 104 P.3d 670.
¶ 49 Similarly here, there is a significant difference between the sentences for second degree murder and for first and second degree manslaughter. Grier had no prior criminal record. Thus, with an offender score of zero, a conviction for second degree murder exposed her to a sentencing range of 123-220 months in prison. RCW 9.94A.510; RCW 9.94A.515. In failing to request lesser included manslaughter instructions, defense counsel abandoned the chance that Grier would be exposed to a much lower sentencing range of only 78-102 months for first degree manslaughter or 21-27 months for second degree manslaughter. RCW 9.94A.510; RCW 9.94A.515. The difference between the maximum sentences for second degree manslaughter and second degree murder is 193 months, a significant amount of time, greater than the sentencing discrepancies in Ward and Pittman.

b. Self-defense theory applies to both murder and manslaughter
¶ 50 Requesting first and second degree manslaughter instructions would not have harmed Grier's theories of self-defense and defense of another. Self-defense and defense of another are complete defenses to both murder and manslaughter charges. See State v. Negrin, 37 Wash.App. 516, 519-21, 681 P.2d 1287, review denied, 102 Wash.2d 1002 (1984). Therefore, if the jury believed that Grier had acted lawfully in defense of herself or her son, then the jury could have acquitted her on both the greater and lesser *1234 charges if they had been so instructed. As in Ward, Grier would not have compromised her defense theories by requesting lesser included manslaughter instructions. Ward, 125 Wash.App. at 249, 104 P.3d 670.

c. "All-or-nothing" tactic highly risky given totally of trial circumstances
¶ 51 In theory, the "all or nothing" defense tactic is effective when one of the elements of a crime is highly disputed and the State has failed to establish every element beyond a reasonable doubt; in such a situation, the jury must acquit the defendant based on a reasonable doubt about proof of that element. Ward, 125 Wash.App. at 250, 104 P.3d 670 (quoting Keeble v. United States, 412 U.S. 205, 212-13, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973)). Here, Grier's defense counsel likely hoped for an acquittal, relying on the scant direct evidence that Grier intended to kill Owen, or was even armed, and the relatively strong evidence that Grier was acting in self defense or defense of her son as Owen advanced toward her in her own home.
¶ 52 But defense counsel's asking the jury to acquit Grier on the insufficient evidence of the intent element alone was unreasonable because of the overwhelming evidence that Grier was guilty of some offense: In short, Owen's being shot and killed was highly disproportionate to his advancing toward Grier and shoving her. To illustrate this point, we return to Pittman and Ward, which both quote the following from Keeble:
[I]t is no answer to petitioner's demand for a jury instruction on a lesser offense to argue that a defendant may be better off without such an instruction. True, if the prosecution has not established beyond a reasonable doubt every element of the offense charged, and if no lesser offense instruction is offered, the jury must, as a theoretical matter, return a verdict of acquittal. But a defendant is entitled to a lesser offense instruction . . . precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory. Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of some offense, the jury is likely to resolve its doubts in favor of conviction.
Keeble, 412 U.S. at 212-13, 93 S.Ct. 1993; Pittman, 134 Wash.App. at 388, 166 P.3d 720; Ward, 125 Wash.App. at 250, 104 P.3d 670. Given the evidence here, defense counsel's failure to request lesser included manslaughter instructions left the jury highly likely to resolve its doubts in favor of convicting Grier, which, in fact they did.
¶ 53 Owen was shot and killed after a scuffle with Grier. Nathan and Michaels both testified that Grier and Owen were in the same room when the shooting occurred. The trace analyst found gun powder residue on Grier's clothes. Grier had openly carried weapons throughout the night, at one point waving a gun at Nathan. The jury heard testimony that Grier had relied on guns to solve her problems in the past: Nathan testified that Grier had previously fired her guns into the air to scare off strangers who frightened her by pulling into her driveway and revving their engines. Starr testified that Grier had said that evening that she (Grier) "had to confront the man [who she believed her boyfriend sent to rape her] with a 9 millimeter and that's how she ended up with the two guns." And just before the shooting, Grier had confronted Owen and Starr with a shotgun in an attempt to retrieve the two guns that Owen had stolen from her earlier. Even though Owen took Grier's shotgun, as well as her other two guns, there was evidence to support that she was guilty of some level of homicide, unless justified by acting in self-defense.
¶ 54 Given the testimony about Grier's attitude toward and obsession with guns and in light of the discrepancy between the amount of force with which Owen had advanced compared to his ending up shot to death, it was highly risky to rely on the chance that the jury would find Grier justified in acting in self-defense. Given the significant difference in penalties between manslaughter and murder convictions (both of which self-defense and defense of another would negate), and because the evidence also strongly suggested that Grier had somehow shot Owen, it was an unreasonable defense tactic to ask the jury either to find that Grier had the intent to *1235 shoot and to kill Owen, or at least to assault him, or to acquit her altogether. Because Grier was entitled to instructions on the lesser included manslaughter offenses, and because the failure to request the instructions was not a legitimate strategy under the circumstances, Grier meets the first prong of the ineffective assistance of counsel test, deficient performance.

B. Prejudice
¶ 55 In order to meet the ineffective assistance of counsel test, the defendant must also demonstrate a reasonable probability that, but for defense counsel's deficient performance, the trial results would have differed. See Pittman, 134 Wash.App. at 390, 166 P.3d 720. The record before us speaks loudly for itself.
¶ 56 Defense counsel's failure to request lesser included instructions significantly prejudiced Grier. As the court in Pittman warned, the lack of lesser included instructions, where warranted by the evidence, puts in an untenable position a jury that is convinced beyond a reasonable doubt that she has committed a crime: The jury wants to hold the defendant culpable and to convict her of some crime, but is given only one option, here, second degree murder. Id. at 388, 166 P.3d 720. This untenable position manifested itself here in the jury's unusual anomalous verdicts: The jury held Grier criminally culpable for Owen's death, which undisputedly was caused by a gunshot, and found her guilty of second degree murder of Owen, whose death was undisputedly caused by a fatal gunshot. Yet the jury also found that Grier was not armed with a firearm when she murdered Owen, as evinced by their answering "no" on the firearm special verdict form.
¶ 57 These seemingly contradictory verdicts support an inference that the jury believed Grier should be held accountable for causing Owen's death, but that it also had reservations about her level of culpability. For example, on the evidence before it, the jury could have believed that Owen brought the gun into Grier's home, but during the scuffle, Grier somehow caused it to fire the fatal shot. If that were the case, the jury's verdict was more consistent with a manslaughter verdict than a murder verdict. But defense counsel's "all or nothing" approach removed the manslaughter verdict option from the jury's consideration. Under these circumstances, there is a reasonable probability that Grier's trial would have turned out differently had counsel requested, and had the trial court given, lesser included manslaughter instructions. Thus, Grier meets the second prong of the ineffective assistance of counsel test. Townsend, 142 Wash.2d at 844, 15 P.3d 145; Matter of Pirtle, 136 Wash.2d at 487, 965 P.2d 593. We hold, therefore, that Grier has established ineffective assistance of counsel.[22]
¶ 58 Accordingly, we reverse and remand for a new trial.[23]
We concur: HOUGHTON, J., and VAN DEREN, C.J.
NOTES
[1] In addition to the dispositive argument, which we address below, Grier argues that (1) the trial court violated her right to due process by vacating an earlier order requiring Western State Hospital to evaluate whether she was competent to stand trial; (2) the prosecutor committed misconduct by eliciting testimony in violation of an order in limine not to mention her having possessed marijuana; (3) the trial court erred by admitting prejudicial evidence; (4) her counsel was ineffective for failing to object to irrelevant, prejudicial evidence and to request limiting instructions; and (5) the trial court erroneously required Grier to undergo mental health and substance abuse evaluations as conditions of community custody. In her Statement of Additional Grounds, she also argues that the prosecutor wrongly instructed her son, Nathan Grier, that he could not talk about the victim's drug use.
[2] RAP 10.10.
[3] For clarity, we refer to Nathan Grier as "Nathan"; we intend no disrespect.
[4] Both Nathan and Michaels were 18 years old by the time of trial.
[5] According to Nathan, Grier had fired her guns at a shooting range on previous occasions. She had also fired one of the guns into the air outside her house to scare off strangers who frightened her in her driveway; these strangers would pull into Grier's driveway with their lights off and "rev their engines, like, three times a night."
[6] According to Starr, however, this conversation had occurred earlier in the evening, before she took Grier to the liquor store.
[7] Starr did not recall Owen's hitting Nathan at this point.
[8] According to Starr, Owen was purchasing the gun from Nathan.
[9] Nathan later testified:

And he shoves my head up against the wall and stuck that little gun in my mouth, you know, pretty hard, and it, like, ripped the top of my mouth. And he was saying, Whose gun is it; whose gun is it? . . . And I just looked at him and said, All right. And he takes it out, and he said, It's Greg's gun, now shut up, and all this. And I'm not going to get into a big problem over this, you know. He is drunk.
Report of Proceedings (RP) Vol. 2 at 150-51.
[10] According to Nathan, Owen put only the bedding in the car and kept the gun under his sweater.
[11] According to Starr, Owen went back into Grier's house because they could not find their car keys, which they thought might be inside. Michaels also testified that Starr and Owen had lost their keys and that she (Michaels) helped them look for the keys.
[12] According to Starr, she was outside when she heard the shot, ran to the house, and "saw Greg [Owen] laying [sic] on the ground and Ms. Grier above him, pulling at his jacket, calling him names."
[13] Michaels clarified later that "[s]he [Grier] said she could [kill me]. She didn't say she was going to." (Emphasis added.)
[14] The trial court instructed the jury that it need not be unanimous as to the means of committing second degree murder. Thus, it is not clear whether the jury convicted Grier of second degree murder based on intentional murder or felony murder.
[15] In particular, we need not address a key issue that both counsel include in their briefs on appeal  whether the second superior court judge's vacating the first superior court judge's order for a competency evaluation violated Grier's rights. If on remand there arises any issue of Grier's competency to stand trial at that time, then it will be for the trial court to determine whether to order an evaluation.
[16] State v. Workman, 90 Wash.2d 443, 447-48, 584 P.2d 382 (1978).
[17] RCW 9A.08.010(2) provides:

When a statute provides that criminal negligence suffices to establish an element of an offense, such element also is established if a person acts intentionally, knowingly, or recklessly. When recklessness suffices to establish an element, such element also is established if a person acts intentionally or knowingly. When acting knowingly suffices to establish an element, such element also is established if a person acts intentionally.
[18] We note that first and second degree manslaughter are lesser included offenses of second degree intentional murder, but not of second degree felony murder. Here, the State charged Grier with both intentional and felony second degree murder. Therefore, she was entitled to the manslaughter instructions, especially because the trial court did not require the jury to be unanimous as to whether the second degree murder was intentional or based on an underlying felony.
[19] Our Supreme Court explains this theory in Schaffer:

[A] defendant who reasonably believes he is in imminent danger and needs to act in self-defense, "but recklessly or negligently used more force than was necessary to repel the attack," is entitled to an instruction on manslaughter. State v. Jones, 95 Wn.2d [616,] 623[, 628 P.2d 472 (1981)]; see State v. Hughes, 106 Wn.2d [176,] 190[, 721 P.2d 902 (1986)]. In its brief on appeal, the State said "the evidence presented by the defense [showed] that for Schaffer, given his upbringing and his background, deadly force would be a reasonable act for someone in his position." Br. of Resp't at 53. The State thereby conceded there was sufficient evidence to permit the jury to find Schaffer acted in the reasonable belief he was in imminent danger. The additional evidence  that Schaffer shot the victim five times including twice in the back  was sufficient to support a finding that he recklessly or negligently used excessive force to repel the danger he perceived. The jury should therefore have been instructed on manslaughter as a lesser included offense to the first degree murder alternative.
Schaffer, 135 Wash.2d at 358, 957 P.2d 214 (emphasis added).
[20] Hendrickson, 129 Wash.2d at 77, 917 P.2d 563.
[21] Davis, 152 Wash.2d at 673, 101 P.3d 1 (quoting Kimmelman v. Morrison, 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986)).
[22] In so holding, we do not alter the general rule that we will not second guess counsel's legitimate trial tactics. See Varga, 151 Wash.2d at 199, 86 P.3d 139 (citing Garrett, 124 Wash.2d at 520, 881 P.2d 185). Nor do we intend to open the door to an ineffective assistance challenge every time counsel uses the "all-or-nothing" tactic to a defendant's disadvantage. In short, we do not retreat from the well settled rule that the right to effective assistance of counsel does not guarantee a defendant "`successful assistance of counsel' (i.e., acquittal)." State v. Adams, 91 Wash.2d 86, -90, 586 P.2d 1168 (1978) (quoting State v. White, 81 Wash.2d 223, 225, 500 P.2d 1242 (1972)).

Nevertheless, we are convinced that the exceptional circumstances of this case required closer scrutiny: The jury's anomalous verdicts finding Grier guilty of second degree murder as a result of Owen's fatal gunshot wound, while simultaneously finding she was not armed with a firearm when she caused his death, and the nebulous facts surrounding Owen's death, especially Owen's having stolen Grier's firearms and barging back into her home, uninvited, to assault her after earlier injuring her son. This unusual record persuades us that defense counsel's "all-or-nothing" strategy prejudiced Grier to such a degree that she did not receive a fair trial to which she is entitled. See, e.g., Adams, 91 Wash.2d at 89-90, 586 P.2d 1168.
[23] We note that because this jury found that Grier was not armed with a firearm during this homicide, double jeopardy likely prevents the State from recharging or submitting a special firearm verdict on retrial.