FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE JAN 0 9 2020

CHIEF JUSTICE

This opinion was
filed for record
at 8am on Jan 9, 2020
Susan L. Carlson
Supreme Court Clerk



# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Petitioner, | ) | No. 96344-4 |
| | ) | (consolidated with No. 96345-2) |
| v. | ) | |
| | ) | |
| KARL EMERSON PIERCE, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |
| | ) | |
| STATE OF WASHINGTON, | ) | |
| | ) | |
| Petitioner, | ) | Filed ___ JAN 0 9 2020 ___ |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL WILLIAM BIENHOFF, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

GONZÁLEZ, J.—Our constitutions separate power into many hands. Among those hands are the hands of the jury. CONST. art. I, § 22; U.S. CONST. amend. VI. Juries are just as vital a check on government power as the separation of powers between the legislative, executive, and judicial

1

branches. *See Hale v. Wellpinit Sch. Dist. No. 49*, 165 Wn.2d 494, 504, 198 P.3d 1021 (2009). To perform their vital function, juries must be fairly selected. *State v. Lanciloti*, 165 Wn.2d 661, 667-68, 201 P.3d 323 (2009). Jury selection must be done in a fair way that does not exclude qualified jurors on inappropriate grounds, including race. *See City of Seattle v. Erickson*, 188 Wn.2d 721, 723, 398 P.3d 1124 (2017) (citing *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)); GR 37. As part of their constitutional role, courts ultimately have the obligation of ensuring those before them receive due process of law. *See, e.g., State v. Oppelt*, 172 Wn.2d 285, 288, 257 P.3d 653 (2011); *City of Redmond v. Moore*, 151 Wn.2d 664, 677, 91 P.3d 875 (2004).

Michael Bienhoff and Karl Pierce were tried before a jury and found guilty of first degree felony murder. They contend, among other things, that their jury was not fairly selected because the State improperly elicited a conversation about the death penalty during voir dire and improperly used a peremptory strike to dismiss an African-American juror. The Court of Appeals found that the prosecutor committed misconduct by eliciting a conversation about the death penalty in a noncapital case and that the trial court abused its discretion in not curtailing that conversation. Since that conversation led to the dismissal of at least two jurors, the Court of Appeals

*State v. Pierce*, No. 96344-4 (consolidated with *State v. Bienhoff*, No. 96345-2)

reversed both men's convictions. We affirm the Court of Appeals on different grounds.

FACTS

One day in Woodland Park, shortly before I-502[1] passed, a group of men met ostensibly to buy and sell cannabis. Before the end of that day, one of those men, Precious Reed, had been killed in a gunfight. Bienhoff and Pierce were charged with first degree felony murder predicated on first degree robbery. Based on the facts alleged in the statement of probable cause, they could have been charged with first degree aggravated murder, which potentially carried a death sentence at the time. RCW 10.95.020(11)(a); RCW 9A.32.030(1)(a). The State elected not to seek the death penalty.

A large panel of potential jurors was summoned. Under Washington law at the time, it was error to inform these potential jurors about the possible sentencing consequences the defendants faced. *State v. Townsend*, 142 Wn.2d 838, 846, 15 P.3d 145 (2001) (quoting *Shannon v. United States*, 512 U.S. 573, 579, 114 S. Ct. 2419, 129 L. Ed. 2d 459 (1994)). This prohibition specifically extended to the death penalty. *Id.* The prosecutor

---

[1] Initiative 502 largely decriminalized cannabis under Washington State law; created a regulatory system to oversee its production, processing, and distribution; and subjected it to excise taxes. LAWS OF 2013, ch. 3.

3

asked the trial judge how they should proceed if jurors, as they often do, asked whether the death penalty was being sought. The trial judge said he had, in the past, "evaded the question," but he was willing to address the issue "with the group as a whole, if that's what counsel thinks I need to do." Verbatim Tr. of Proceedings (VTP) (Sept. 21, 2015) at 406. The prosecutor responded:

> The State's preference is to address it head on, of course, in accordance with the law, which is to instruct them that our state Supreme Court has decided that that is not something that they are privy to, or we cannot tell them if this is a death penalty case or not, and then ask them the follow-up question. Basically, not knowing whether this is a death penalty case or not, does that cause you concern as to whether or not you could be a fair and/or impartial juror in this case.

*Id.* The trial judge was concerned about that approach:

> My preference would be not to ask the follow-up question, but just tell them that and then go on and then see if any of them raises the issue beyond that. But I don't know what you think about that.
>
> The problem is if I invite them to say, you know, can you be fair and impartial, then anybody who for some reason or other couldn't like the idea of being here has a good way to head for the door.

*Id.* at 406-07. The question of how to deal with the death penalty was not resolved that day.

A few days later, during voir dire, prospective juror 56 said, "My conscience is going to bother me all my life" if he voted to convict someone

4

who later proved to be innocent, especially if that person served a long

sentence. VTP (Sept. 23, 2015) at 798-99. After some probing by the court,

juror 56 said he did not believe he could be a fair juror on this case and was

dismissed for cause. That afternoon, the prosecutor "switch[ed] gears" and

reminded the remaining panel members that "Juror Number 56 . . . realized

. . . the weight of being a juror was not something that he could deal with."

*Id.* at 824. The prosecutor emphasized that the jury's sole role was to decide

whether the State had met its burden of proof and not to concern itself with

punishment. After the prosecutor asked the jurors if they "underst[oo]d

that," were "concern[ed] about that," or thought that "doesn't make sense,"

among similar questions, the following exchange occurred:

> (Juror Number 1)[:] Is there a death sentence thing in the state of Washington? That might bother me.
> MR. YIP[2]: I will let the judge answer that question.
> THE COURT: The Washington Supreme Court has said that I can't tell you whether a death sentence is involved or not.
> BY MR. YIP:
> Q. So our wise Washington Supreme Court has said that the judge cannot tell you whether or not this is a death penalty case or whether or not that is a potential outcome.
> And I will get to the cards that are being raised right now.
> So the ultimate question that I'm going to ask you is, with that in mind that the judge can't tell you and you won't know, does that cause you any concern about being a juror in this case where the charge is murder in the first degree?
> Juror Number 5.

---

[2] Wyman Yip represented the State at trial.

A. So—and I know you can't tell us, but if that's a possibility at all, yes, I have concern with that. Because like we have said before, evidence can come out later. And if they are sentenced to death, I have an issue with that, because I don't—not that I'm making the call of their punishment, but I don't want to find them guilty if that should be the case and then an irreversible decision has been made.

As awful as it would be if they were later found out innocent and still in jail, that's not nearly as bad as if they had a death penalty.

*Id.* at 825-26.

In the wake of this discussion, jurors 1, 5, 6, 15, 20, 39, 76, 98, 116, and 131 all expressed concerns about sitting on a jury in a possible death penalty case. Upon further questioning, most assured the court that they could be fair. Juror 76, however, reported that the weight of sending someone to a long prison sentence or death weighed so heavily on her that she could not finish her lunch.

Juror 6, apparently the only African-American potential juror in the courtroom at that time, said, "I wouldn't want to be responsible for sending somebody—penalizing them to the death penalty, whether I knew beforehand or not. I wouldn't feel comfortable also with sending someone to jail for life." *Id.* at 827. The prosecutor stressed that the jurors do not decide the sentence. Juror 6 acknowledged the point but observed, "[T]he decision that we, as jurors, would make would be instrumental in deciding the fate of another person, which I don't want that kind of responsibility on my shoulders." *Id.* at 828. When asked directly if she could be fair, juror 6

6

said, "I can. I can." *Id.* Later, however, juror 6 said that without knowing

whether the death penalty was a possibility she "would not be able to make a

decision in this case." *Id.* at 833. The State moved to strike juror 6 for

cause.

Outside the presence of the jury, defense counsel raised "a very, very

strenuous objection to the proceeding that we have, and I'm afraid I have to

ask for a mistrial." *Id.* at 838. Counsel was concerned that the State was

identifying jurors with "qualms about something that is completely

irrelevant in this case" and that it was attempting to "death-qualify" the

jury.[3] *Id.* at 838-39. The prosecutor denied he was trying to death-qualify

the jury. The trial court found that the prosecutor had not done anything

"improper in any way. It's the juror that first brought up the death penalty."

*Id.* at 846. The State moved to dismiss jurors 6 and 76 for cause.

Both juror 6 and juror 76 were brought back to be questioned

individually. The judge again stressed to juror 6, "I am not allowed to tell

you whether this is a capital case" and "the question of whether the death

penalty would be imposed is a separate proceeding at which there can be

---

[3] "'[D]eath qualification' is the process whereby prospective jurors are asked about the death penalty and excluded from the final panel if they oppose it." *State v. Hughes*, 106 Wn.2d 176, 180, 721 P.2d 902 (1986). There is evidence that death-qualifying a jury makes it more likely to convict. *See id.* at 182-83. This evidence has been contested. *Id.*

7

additional evidence that would be determined by a jury that follows any trial and any conviction." *Id.* at 871-72.

When asked directly, given that the jury has nothing to do with sentencing, "could [you] be a fair and impartial juror in this case?" Juror 6 replied:

> I would have to say no. I think that if I had the opportunity before coming to look up those kinds of things, I would feel more comfortable making a decision like that. But without knowing what—knowing that—not that my decision would have any basis on sentencing, but knowing it could have a basis on the outcome of somebody's life, it still—I think that that would haunt me to, in the back of my mind, know that without knowing.

*Id.* at 873. Juror 6 also expressed reservations about rendering a verdict that could result in a life sentence. After some leading questions by defense counsel, the juror clarified, "I think that my views can be fair, and I think that they can be impartial. I am very hesitant about making a decision that would weigh that heavily upon somebody's life, but I feel that I am capable of making a fair and impartial decision." *Id.* at 878. The trial judge denied the motion to dismiss juror 6 for cause. Juror 76 was dismissed for cause based on her emotional reaction to the idea of sitting on a death penalty case.

Voir dire resumed the next day with juror 6 still on the panel. After several hours of questioning (in which juror 6 did not speak), the State brought a peremptory challenge against her. The defense immediately raised

an unsuccessful *Batson* challenge that will be discussed in more detail below. A jury was seated, and the case was tried over the next month.

After closing arguments, the judge instructed the alternate jurors, "Thank you very much for your careful attention to the case. It won't be necessary for you to serve further. Please don't discuss the case with anyone or indicate how you would have voted until the jury returns its verdict." VTP (Oct. 29, 2015) at 3898. The remaining jurors were instructed:

> So, ladies and gentlemen, the case is now in your hands. If you will retire to the jury room, the bailiff will bring you the exhibits, though we'll probably do that on Monday because we're at the end of the day today, and I understand you're not coming in tomorrow, and then you will be able to commence your deliberations.

*Id.* That day was a Thursday. Perhaps because it was the end of the day and the jurors were not going to be together for the next three days, the trial judge did not tell them not to discuss the case until they were formally seated on Monday.

After the jurors had been let go for the night, the bailiff and counsel saw one of the jurors, juror 5, having a lengthy conversation with an observer in the courtroom.[4] That observer had been present when the defendants were brought in, escorted by jail officers, and had been present for several conversations that the jury was not. While the jury was seated in

---

[4] Some of the record reports this as juror 4, but this appears to be a mistake.

9

the jury room, but apparently before the jury was thought to have begun deliberating, the defense moved to have juror 5 removed and replaced with an alternate.

That Friday, the trial judge asked all the jurors, including the alternates, to come in on Monday. That Monday, juror 5 was brought into the courtroom, separate from the other jurors, where she reported that the observer was a friend who was interested in the case. Juror 5 had invited her to observe closing arguments. The trial judge decided to excuse the juror and seat an alternate. All the remaining jurors were brought in and an alternate seated. The jurors were then sent back into the jury room and instructed to "commence your deliberations." VTP (Nov. 2, 2015) at 3929.

After two and a half days of deliberation, the jury found Bienhoff and Pierce guilty of first degree murder. Bienhoff was sentenced to life without parole as a persistent offender.

The Court of Appeals concluded that the prosecutor committed misconduct by eliciting a discussion of the death penalty and reversed.[5] We granted the State's petitions for review and consolidated the cases. *State v. Pierce*, 192 Wn.2d 1015 (2019). We also granted review of some of the

---

[5] *State v. Bienhoff*, No. 74519-1-I, slip op. at 15 & n.33 (Wash. Ct. App. Aug. 27, 2018) (unpublished), https://www.courts.wa.gov/opinions/pdf/745191orderandopinion.pdf; *State v. Pierce*, No. 74363-5-I, slip op. at 13 (Wash. Ct. App. Aug. 27, 2018) (unpublished), https://www.courts.wa.gov/opinions/pdf/743635.pdf.

issues raised in Pierce's answer relating to jury deliberation. *Id.* The Washington Association of Prosecuting Attorneys (WAPA) submitted an amicus brief arguing that *Townsend* should be overruled. The Fred T. Korematsu Center for Law and Equity filed an amicus brief in support of the defendants' argument that juror 6 was improperly dismissed.

ANALYSIS

Bienhoff and Pierce challenge their convictions based on two intertwined errors at voir dire: (1) that the State improperly elicited a conversation about the death penalty and (2) that the State was improperly allowed to exercise a peremptory challenge to dismiss an African-American juror. We agree in part.

The jurisprudential landscape has changed in two relevant ways since this case was tried. First, at the time of trial, it was error to tell the potential jurors during jury selection that they were not being asked to sit on a death penalty case. *Townsend*, 142 Wn.2d at 846 (quoting *Shannon*, 512 U.S. at 579). In *Townsend*, we concluded that "[t]his strict prohibition against informing the jury of sentencing considerations ensures impartial juries and prevents unfair influence on a jury's deliberations." *Id.* We rejected the argument that informing the jury that a case did not involve the death penalty could be a legitimate strategic tactic. *Id.* Our *Townsend* rule has

11

come under criticism from many quarters. *See State v. Rafay*, 168 Wn. App. 734, 779, 285 P.3d 83 (2012) (finding that informing the jury panel that a case did not involve the death penalty could be a legitimate strategic tactic, "[i]n light of the highly publicized circumstances"); Br. of Amicus Curiae WAPA at 4-20 (calling for us to overturn *Townsend*).

Second, in the wake of increasing evidence that the *Batson* rule did not adequately protect our jury selection process from (often unconscious) racial bias, we promulgated GR 37. Under GR 37, if "an objective observer could view race or ethnicity as a factor in the use of [a] peremptory challenge, then the peremptory challenge must be denied." GR 37(e). While GR 37 is prospective, this portion of the test applies to at least pending cases where the error was preserved. *See State v. Jefferson*, 192 Wn.2d 225, 249, 429 P.3d 467 (2018) (modifying *Batson*).

While the prosecutor did not explicitly raise the death penalty during voir dire, as a direct result of his questions, jurors 1, 5, 6, 15, 20, 39, 76, 98, 116, and 131 all expressed concerns about sitting on a jury in a possible death penalty case. As a direct result of the prosecutor's questions, all of the potential jurors' minds were drawn to the possible sentence. This could have had an "unfair influence on a jury's deliberations" sufficient to violate *Townsend*. 142 Wn.2d at 846. The State, joined by WAPA and Pierce, ask

12

us to overrule *Townsend*. Bienhoff asks us to limit *Townsend* in such a way to allow the defense to decide whether to inform the jurors whether a case involves the death penalty.

We will overrule prior precedent when "there has been 'a clear showing that an established rule is incorrect and harmful'" or "'when the legal underpinnings of our precedent have changed or disappeared altogether.'" *Deggs v. Asbestos Corp. Ltd.*, 186 Wn.2d 716, 727-28, 729, 381 P.3d 32 (2016) (quoting *In re Rights to Waters of Stranger Creek*, 77 Wn.2d 649, 653, 466 P.2d 508 (1970); *W.G. Clark Constr. Co. v. Pac. Nw. Reg'l Council of Carpenters*, 180 Wn.2d 54, 66, 322 P.3d 1207 (2014)). We find both standards are met here and overrule *Townsend*.

A major basis of the *Townsend* rule has eroded dramatically: there is currently no lawful death penalty statute in Washington State. *State v. Gregory*, 192 Wn.2d 1, 19, 427 P.3d 621 (2018). As amicus WAPA notes, continuing to follow *Townsend* in a post-*Gregory* world "has the potential to undermine public confidence in the integrity of the judiciary" because it would "foster mistrust in *informed* jurors" who know there is no death penalty in our state. Br. of Amicus Curiae WAPA at 19. We agree.

This case also demonstrates that *Townsend* was incorrect and harmful even without *Gregory*. *Townsend* is incorrect because it fails to recognize

that death is different. *See Furman v. Georgia*, 408 U.S. 238, 286, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) (Brennan, J., concurring). It does not undermine the division of responsibility between the judge and jury to allow prospective jurors to know whether they are on a death penalty case. Overwhelmingly, other courts have approved of telling prospective jurors when the death penalty is not at stake. *See, e.g., State v. Mott*, 187 Ariz. 536, 547, 931 P.2d 1046 (1997) (quoting *State v. Dawson*, 162 Ariz. 429, 430, 783 P.2d 1221 (Ct. App. 1989)); *Pugh v. State*, 351 Ark. 5, 13, 89 S.W.3d 909 (2002); *People v. Hyde*, 166 Cal. App. 3d 463, 479, 212 Cal. Rptr. 440 (1985) (informing the prospective jurors that the case was not a death penalty case was "proper and prudent"); *Stewart v. State*, 254 Ga. 233, 234, 326 S.E.2d 763 (1985) (citing *Waters v. State*, 169 Ga. App. 290, 312 S.E.2d 812 (1983)); *Burgess v. State*, 444 N.E.2d 1193, 1196 (Ind. 1983) ("The possibility of the imposition of a death sentence can be an ever present and secretly held concern of prospective jurors in a murder case and as such might reasonably be expected to improperly influence the manner in which they answer questions on voir dire."); *State v. Wild*, 266 Mont. 331, 337, 880 P.2d 840 (1994) (citing *Dawson*, 162 Ariz. at 430); *State ex rel. Schiff v. Madrid*, 101 N.M. 153, 156, 679 P.2d 821 (1984); *Commonwealth v. Drexel*, 349 Pa. Super. 335, 345, 503 A.2d 27 (1986). Only Massachusetts seems to

14

have held that it is error to instruct a jury when the death penalty is not at issue. *Commonwealth v. Smallwood*, 379 Mass. 878, 883, 401 N.E.2d 802 (1980). The Massachusetts Supreme Judicial Court found that state's death penalty unconstitutional later that year and again four years later. *Dist. Att'y for Suffolk Dist. v. Watson*, 381 Mass. 648, 411 N.E.2d 1274 (1980); *Commonwealth v. Colon-Cruz*, 393 Mass. 150, 163-64, 470 N.E.2d 116 (1984); *see also Commonwealth v. Gunter*, 427 Mass. 259, 270, 692 N.E.2d 515 (1998) (holding a judge's reference to the absence of a death penalty in order to "remove extraneous considerations from interfering with the jury's deliberation, did not amount to reversible error").

*Townsend* is harmful because of the unnecessary pressure it puts on potential jurors, as well as the distorting effect that pressure likely puts on the selection process itself and on the ultimate makeup of the jury. Because of *Townsend,* many more jurors must be summoned in homicide cases than would otherwise be necessary to get a fair jury. It is common to summon over 1,000 potential jurors in death penalty cases to arrive at a death-qualified jury. WASH. STATE BAR ASS'N, FINAL REPORT OF THE DEATH PENALTY SUBCOMMITTEE OF THE COMMITTEE ON PUBLIC DEFENSE 16

*State v. Pierce*, No. 96344-4 (consolidated with *State v. Bienhoff*, No. 96345-2)

(2006).[6] The record does not reveal how many jurors were summoned in this case, but at least 138 were present at voir dire. As this case demonstrates, once the death penalty is raised during voir dire, many jurors express the sort of discomfort with serving that requires their dismissal. As this case also demonstrates, *Townsend* drastically increases the time required for voir dire, as jurors are questioned about their ability to set their concerns about the sentence aside, putting unnecessary burdens on the administration of justice.

*Townsend* is also harmful for the very reasons that undergird GR 37. As WAPA cogently argues, death-qualifying juries disproportionally exclude people of color. Br. of Amicus Curiae WAPA at 14 (quoting Noelle Nasif, Shyam K. Sriram & Eric R.A.N. Smith, *Racial Exclusion and Death Penalty Juries: Can Death Penalty Juries Ever Be Representative?*, 27 KAN. J.L. & PUB. POL'Y 147, 148 & n.15 (2018) (citing Eric P. Baumer et al., *Explaining Spatial Variation in Support for Capital Punishment: A Multilevel Analysis*, 108 AM. J. SOC. 844, 853 (2003); Samuel R. Gross & Phoebe C. Ellsworth, *Hardening of the Attitudes: Americans' Views on the Death Penalty*, 50 J. SOC. ISSUES 19, 21 (1994)). This research is consistent with a recent Pew Research Center survey finding significant racial

---

[6] https://www.wsba.org/docs/default-source/legal-community/committees/council-on-public-defense/death-penalty-report.pdf?sfvrsn=120301f1_14

16

disproportionality in support for the death penalty. J. Baxter Oliphant, *Public Support for the Death Penalty Ticks Up*, PEW RES. CTR. (June 11, 2018), https://www.pewresearch.org/fact-tank/2018/06/11/us-support-for-death-penalty-ticks-up-2018/ [https://perma.cc/2TGH-BRR3]. Hewing to a rule that has a disproportional effect of eliminating people of color undermines our commitment to fostering juries that reflect our society. *See* GR 37; *Erickson*, 188 Wn.2d at 723.

This case vividly illustrates the harm caused by *Townsend*. The judge and counsel tried hard to follow *Townsend* during voir dire, leading directly to the State's attempt to dismiss juror 6 and the resulting *Batson* challenge. As WAPA argues in this court, however, *Townsend* leads to death-qualification and death-qualification has a racially disproportionate impact. We therefore hold that exercising a peremptory challenge to remove a juror who does not "qualify" under death-qualification questioning is a presumptively invalid basis for exercising a peremptory challenge. As we read the record, that is precisely what happened here. During the *Batson* discussion, the State justified its attempt to excuse juror 6 on grounds that violate *Jefferson* and GR 37. The State invoked the fact that juror 6 had a brother who was convicted of attempted murder and that the process of conviction and sentence "left a bad taste in her mouth." VTP (Sept. 24,

2015) at 1019. These reasons for dismissal are presumptively invalid under GR 37(h)(i)-(iii). The State noted that juror 6 "had strong opinions" that "the system, or at least parts of the system, did not treat her brother fairly." *Id.* This reason is presumptively invalid under GR 37(h)(ii) and (iii). The State repeatedly stressed that juror 6 frequently paused before answering questions, potentially violating GR 37(i). *Id.* at 1017-19. Juror 6's dismissal violated GR 37(e)'s injunction that the challenge must be rejected if "an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge." [7]

CONCLUSION

We hold that *Townsend* is incorrect and harmful because it artificially prohibits informing potential jurors whether they are being asked to sit on a death penalty case. This case illustrates some of the ongoing harm *Townsend* has caused because the cramped conversation about sentencing consequences directly led to the improper dismissal of a juror. Accordingly, we overrule *Townsend*. Because an objective observer could conclude that race was a factor in the State's peremptory challenge to juror 6, we affirm

---

[7] We respectfully disagree with our dissenting colleagues that an objective observer could not have viewed race as a factor in the use of the peremptory challenge. The dissent transforms GR 37(e)'s mandate that a peremptory challenge must be denied when "an objective observer could view race or ethnicity as a factor" into review of an unmade appeal of the denial of the State's for-cause challenge.

18

*State v. Pierce*, No. 96344-4 (consolidated with *State v. Bienhoff*, No. 96345-2)

the Court of Appeals in result and remand to the trial court for further

proceedings consistent with this opinion.

*Gonzáles, J.*

WE CONCUR:

_____

_____            *Wiggins, J.*

_____

_____            *J., J*

*State v. Pierce (Karl)*; *State v. Bienhoff (Michael)*
(Stephens, J., concurring)


No. 96344-4
(consol. w/ No. 96345-2)


STEPHENS, J. (concurring)—Both the lead and dissenting opinions agree that our decision in *State v. Townsend*,[1] espouses an idea whose time has passed. The difference between these opinions, as I read them, is that the dissent would only refuse to apply *Townsend* prospectively, concluding its legal underpinnings have disappeared in light of *State v. Gregory*.[2] Dissent at 3-5. The lead opinion would overrule *Townsend* entirely, not only because its legal moorings have collapsed, but also because it has proved to be incorrect and harmful. Lead opinion at 13-17. Neither the lead nor dissenting opinion, however, would reverse the defendants' convictions based on the extensive death-qualification discussion that ensued during voir dire.

I would. For a variety of reasons, the voir dire in this case grew focused on questions of punishment, including whether this case involved the death penalty. As

---

[1] 142 Wn.2d 838, 15 P.3d 145 (2001).
[2] 192 Wn.2d 1, 427 P.3d 621 (2018).

the lead opinion observes, at least 10 jurors expressed concerns about deciding a possible death penalty case. The questioning of juror 6 followed her statement that she "wouldn't want to be responsible for sending somebody—penalizing them to the death penalty, whether I knew beforehand or not. I wouldn't feel comfortable also with sending someone to jail for life." Verbatim Tr. of Proceedings (Sept. 23, 2015) at 827. Defense counsel timely objected to the entire area of questioning and moved for a mistrial, but the trial court denied the motion. I believe this was error. It is not necessary to pinpoint the source of the error to prosecutorial misconduct, as the Court of Appeals did below. Things simply went awry, and it was incumbent on the trial court to recognize the problem and its impact on fairly selecting a jury. The court abused its discretion by denying a mistrial on the ground that a juror—not the State—first brought up the death penalty. It does not matter how the topic came up; the situation resulted in incurable prejudice, largely due to everyone's attempt to comply with the unfortunate rule in *Townsend*.

I would resolve this case by overruling *Townsend* and holding that its application in this case resulted in reversible error. That resolution focuses on the error that is at the heart of this trial and makes it unnecessary to consider how to apply the analysis of GR 37 to this 2015 trial. On this basis, I concur in the judgment reversing the defendants' convictions and remanding for further proceedings.

Stephens, C.J.

Geo. McCld, Jr.

*State v. Pierce (Karl); State v. Bienhoff (Michael)*

No. 96344-4
(consol. w/ No. 96345-2)

MADSEN, J. (dissenting)—The lead opinion overrules our decision in *State v. Townsend*, 142 Wn.2d 838, 15 P.3d 145 (2001), and affirms the Court of Appeals' reversal of defendants' convictions for first degree murder on the basis that the excusal of two jurors was improper. I disagree on both points, and therefore, I dissent.

I

I agree, in part, with the Court of Appeals that the trial court properly advised the venire in compliance with *Townsend* and *State v. Hicks*, 163 Wn.2d 477, 181 P.3d 831 (2008), which were controlling precedent at the time of the 2015 voir dire proceeding at issue in this case. The Court of Appeals went on to hold, however, that the prosecutor committed misconduct in his voir dire questioning of potential jurors because his questions elicited comments from jurors about the death penalty. But, as the trial court correctly noted, a juror, not the prosecutor, raised the death penalty issue by specifically inquiring about death penalty availability in this murder trial. The trial court then correctly advised jurors that it could not tell them if the death penalty was involved in the case (in compliance with *Townsend*). The court further informed jurors that their role

was limited to determining guilt and that any sentencing was the court's responsibility (in compliance with *Hicks*). This was not error.

In *Townsend*, we noted that "overwhelming authority" supports the notion that "the jury in a noncapital case may not be informed about the penalty for the charged crime." 142 Wn.2d at 846. "'[I]t is well established that when a jury has no sentencing function, it should be admonished to reach its verdict without regard to what sentence might be imposed.'" *Id.* (internal quotation marks omitted) (quoting *Shannon v. United States*, 512 U.S. 573, 579, 114 S. Ct. 2419, 129 L. Ed. 2d 459 (1994)) "'The question of the sentence to be imposed by the court is never a proper issue for the jury's deliberation, except in capital cases.'" *Id.* (quoting *State v. Bowman*, 57 Wn.2d 266, 271, 356 P.2d 999 (1960)). This court opined, "This strict prohibition against informing the jury of sentencing considerations ensures impartial juries and prevents unfair influence on a jury's deliberations." *Id.* Accordingly, in *Townsend* this court adhered to "the long-standing rule that no mention may be made of sentencing in noncapital cases." *Id.* at 847.

In *Hicks*, this court reiterated that "it is error to inform the jury during voir dire in a noncapital case that the death penalty is not involved." 163 Wn.2d at 487 (citing *Townsend*, 142 Wn.2d at 840). In *Hicks*, this court acknowledged that it had recently "declined to recognize a distinction between a court or counsel-initiated and a juror-initiated discussion of the inapplicability of the death penalty." *Id.* (citing *State v. Mason*, 160 Wn.2d 910, 929, 162 P.3d 396 (2007)). Accordingly, this court concluded that

2

"under our precedent, in response to any mention of capital punishment, the trial judge should state generally that the jury is not to consider sentencing." *Id.*

That is what occurred here—a juror brought up the issue of the death penalty, and the trial court instructed the jury as to its proper role. There was no error under *Townsend* and *Hicks*, the controlling precedent at that time.

Turning to the lead opinion's disavowal of *Townsend* (joined by the concurrence), I do not disagree that after our 2018 decision in *State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018), *Townsend*'s prohibition need not be prospectively applied. But prior to our *Gregory* decision, *Townsend* was established precedent and was applicable to the 2015 proceedings at issue here. In my view, the lead opinion's compulsion to overrule *Townsend* in the context of the present case is unwarranted and incorrect.

As we stated in *W.G. Clark Construction Co. v. Pacific Northwest Regional Council of Carpenters*, agreeing with the First Circuit Court of Appeals, "'*stare decisis* is neither a straightjacket nor an immutable rule; it leaves room for courts to balance their respect for precedent against insights gleaned from new developments, and to make informed judgments as to whether earlier decisions retain preclusive force.'" 180 Wn.2d 54, 66, 322 P.3d 1207 (2014) (quoting *Carpenters Local Union No. 26 v. U.S. Fid. & Guar. Co.*, 215 F.3d 136, 142 (1st Cir. 2000)). Accordingly, "we can reconsider our precedent not only when it has been shown to be incorrect and harmful but also when the legal underpinnings of our precedent have changed or disappeared altogether." *Id.* "[S]tare decisis may yield when a precedent's 'underpinnings [have been] eroded.'" *Id.*

3

(second alteration in original) (quoting *United States v. Gaudin,* 515 U.S. 506, 521, 115 S. Ct. 2310, 132 L. Ed. 2d 444 (1995)). "[R]eview of a precedent might be justified when 'related principles of law have so far developed as to have left the old rule no more than a remnant of abandoned doctrine.'" *Id.* at 66-67 (quoting *Planned Parenthood of Se. Pa. v. Casey,* 505 U.S. 833, 854-55, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992)).

This court recently applied this principle in *Chong Yim v. City of Seattle,* ___ Wn.2d ___, 451 P.3d 675 (2019). Therein, this court addressed the effects of changing federal precedent regarding the parameters of regulatory takings jurisprudence, noting that the legal underpinnings for our prior decision in *Manufactured Housing Communities of Washington v. State,* 142 Wn.2d 347, 13 P.3d 183 (2000) (plurality opinion), had disappeared. *See Chong Yim,* 451 P.3d at 687 n.2. Nevertheless, this court assumed without deciding that *Manufactured Housing* was correct when it was decided. *Id.* This court ultimately disavowed further application of *Manufactured Housing*'s definition of per se regulatory takings as nonreflective of federal law, which had subsequently been clarified. *Id.* at 687-89. Notably, this court abandoned *Manufactured Housing* not because it was incorrect and harmful but because "'the legal underpinnings of our precedent have changed or disappeared altogether.'" *Id.* at 688 (quoting *W.G. Clark,* 180 Wn.2d at 66). In such circumstance, where the legal underpinnings have dramatically changed, this court pointedly stated, "[W]e need not decide whether [*Manufactured Housing*] is incorrect and harmful." *Id.* In my view, that is the correct approach here.

4

We need not decide whether our precedential decision in *Townsend* is incorrect and harmful in light of the dramatic shift in legal underpinnings that have rendered *Townsend* no longer germane. As noted, *Townsend* articulated a rule prohibiting telling jurors that the case for which they were being seated did not involve the death penalty. That decision was correct when decided in 2001 and controlled the 2015 proceedings at issue here.[1] But, in 2018, this court struck down Washington's death penalty as violative of our state constitution. *See Gregory*, 192 Wn.2d at 19. Thus, *Townsend*'s directive is presently no longer of moment, not because it was incorrect when decided but because the legal landscape that it addressed has recently dramatically shifted.[2]

## II

As for the Court of Appeals' determination that the prosecutor's questions amounted to misconduct, we need not decide that issue to resolve this case. The issue here is whether the State's challenges to jurors 6 and 76 were properly granted. In my view, they were. As the trial court noted, both jurors 6 and 76 indicated to the court that they could not act as jurors in this case. In these circumstances, the State's for cause challenge of juror 76 and its later peremptory challenge of juror 6 were properly granted.

Here, during voir dire on the morning of September 23, 2015, juror 56 responded to defendant Karl Pierce's counsel's questions, indicating that he could not be a juror

---

[1] For the reasons articulated here, I also disagree with the concurrence's view that *Townsend* should be overruled in this case. *See* concurrence at 2.

[2] I acknowledge that consistent with our 2018 decision in *Gregory*, if a potential juror now inquires about the death penalty, a trial court may simply state that Washington currently has no death penalty.

5

because he could not "make a decision which could have a long-term effect." Verbatim Tr. of Proceedings (VTP) (Sept. 23, 2015) at 799. Defense counsel challenged juror 56 for cause, and following further questioning, the trial court excused juror 56 and then excused the venire for lunch. When voir dire resumed, the prosecutor noted that juror 56 "is no longer with us because he realized that . . . the weight of being a juror was not something that he could deal with." *Id.* at 824. The prosecutor asked if anyone else had similar concerns. In response, juror 1 asked if Washington had a death penalty. The prosecutor deferred to the trial judge, who stated, "I can't tell you whether a death sentence is involved or not." *Id.* at 825-26. The prosecutor restated his question: "So the ultimate question that I'm going to ask you is, with that in mind that the judge can't tell you and you won't know, does that cause you any concern about being a juror in this case where the charge is murder in the first degree?" *Id.* at 826. Juror 6 stated in part, "I wouldn't feel comfortable for sending somebody to jail for life . . . . I don't want to be a part of [that decision]." *Id.* at 827. "I don't want that kind of responsibility on my shoulders." *Id.* at 828. The prosecutor acknowledged that "[b]eing a juror is a tough job," but, he stated, "the question isn't whether you want to do it. The question is, can you do it." *Id.* Juror 6 responded, "I can." *Id.*

Later, following another juror's inquiry about whether one could do research on one's own, juror 6 commented, "Without being able to research whether the death penalty is on the table, that makes me—I would not be able to make a decision in this case not knowing that." *Id.* at 833. The prosecutor clarified, "Are you saying that as it

stands . . . not knowing whether or not that's even a possibility . . . you could not . . . fairly deliberate in this case?" *Id.* Juror 6 responded, "Right," and the State moved to strike juror 6 for cause, which the court indicated it was inclined to grant, but it deferred the matter until later. *Id.* at 833-34.

In the meantime, voir dire continued. Responding to another juror's question, the trial court stated, "It's the Court's job to do the sentencing. But your job is to decide guilty or not guilty. Whether the State has proven its case beyond a reasonable doubt." *Id.* at 837. Juror 76, who the court later noted had been visibly upset and crying, stated, "I think just sitting here, I didn't realize that—I don't know if I could make that decision for people. I really get so nervous. I couldn't even eat what I brought for lunch. I can't decide." *Id.* Later, in granting the State's for cause challenge of juror 76, the trial court noted that "76 was upset before there ever was any discussion of a death penalty case. She indicated she was upset at lunch, couldn't eat lunch, and we hadn't even talked about this before lunch." *Id.* at 849.

Meanwhile, concerning the State's for cause challenge of juror 6, defense counsel for Michael Bienhoff requested and was granted further questioning of juror 6 to rehabilitate her. Defense counsel asked, "[D]o you think you could be a fair and impartial juror in this case?" *Id.* at 873. Juror 6 responded, "I would have to say no. . . . [K]nowing [my decision] could have a basis on the outcome of somebody's life, it still— I think that that would haunt me." *Id.* Juror 6 explained that she would feel "extremely conflicted . . . knowing that my decision could impact somebody being incarcerated for

life." *Id.* at 874. Juror 6 explained that making a decision "[t]hat could potentially impact the rest of their lives . . . [is] not something I want to do at all. I just don't feel comfortable. I just feel like that kind of judgment at this time isn't appropriate for me." *Id.* at 875. Defense counsel pressed juror 6, stating, "[W]e need juries that are representative of the diversity of the community." *Id.* at 876. Defense counsel asked, "[I]t seems to me that you might be a very good juror. So that's why I am asking, do you really think that you would [not be] able to be fair and impartial?" *Id.* at 877. Juror 6 stated, "I think that my views can be fair, and I think that they can be impartial. I am very hesitant about making a decision that would weigh that heavily upon somebody's life, but I feel that I am capable of making a fair and impartial decision." *Id.* at 878. The prosecutor then asked juror 6 in clarification, "[E]arlier . . . I think you said, I can be fair and impartial, but not knowing whether this carries a life sentence or whatever, I can't do it. Am I characterizing that correctly?" *Id.* at 880. To which juror 6 replied, "Right." *Id.* The prosecutor then asked, "Do you still feel that way?" *Id.* To which juror 6 answered, "I feel like that's something that I am not in position to judge on, yes. I don't feel that that's my place, without having more information about what the implications of that are." *Id.* The trial court interjected, stating, "The issue obviously is whether you can do your job as a juror or not. And that's what we are trying to determine, because before the break, it sounded like you were saying that you couldn't, and that's what we are trying to figure out. It's can you—under those circumstances, can you do the job of a juror, which is to decide has the State proven its case beyond a reasonable doubt or not."

8

*Id.* at 881. Juror 6 responded, "I don't know if there is any way that I can even answer that. I don't know how to answer it. I really don't. I don't know . . . I am not sure." *Id.* The trial court then denied the State's for cause challenge of juror 6, stating, "I don't think that we have got a clear statement from the juror that she can't do the job." *Id.* at 882.

Later, the State exercised a peremptory challenge to juror 6. Bienhoff's defense counsel raised a *Batson*[3] challenge, stating, "[B]ecause [juror 6] is the only African-American in the jury box at this point, at least on its face, it looks as if it may be a racially based challenge." VTP (Sept. 24, 2015) at 1014. The State responded, explaining that "the overriding reason is the Court [initially] granted a 'for cause' challenge for number 6, because Juror Number 6 specifically said that she couldn't do the job. . . . She wasn't rehabilitated. She said she couldn't do the job." *Id.* at 1016-17. The State noted that even when the trial court "asked her ultimately, can you do it, she didn't say, 'Yes.' She paused for a long time and said, 'I don't know.' And because of that . . . the Court changed its mind and didn't allow her to be stricken for cause . . . . The State still believes that she should be stricken for cause. But that, in and of itself, is a very strong reason why the State is exercising its peremptory challenge on Juror Number 6. It

---

[3] *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986). As we noted in *Hicks*, *Batson* outlines a three-part process to determine whether a prosecutor has excluded a juror based on race. First, the challenger must make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. Second, (if the prima facie case is met) the burden shifts to the State to come forward with a neutral explanation for challenging the juror. And third, the trial court then has the duty to determine if the defendant has established purposeful discrimination. *See Hicks*, 163 Wn.2d at 489 (discussing *Batson*).

9

has nothing to do with her race. . . . [S]he specifically cannot assure us that she can actually deliberate and do her job." *Id.* at 1017-18. The trial court then ruled, "I will allow the State to exercise its peremptory in that fashion. I find that it's not a violation of [*Batson*]. The State clearly has nondiscriminatory reasons for exercising its peremptory challenge against Juror Number 6." *Id.* at 1020. I agree with that determination; there was no error here.

The lead opinion applies GR 37 and this court's recent decision in *State v. Jefferson*, 192 Wn.2d 225, 429 P.3d 467 (2018), in reaching the opposite conclusion. But neither GR 37 nor the *Jefferson* decision existed prior to 2018, and in my view, for that reason alone, neither applies to the 2015 proceeding at issue here.

Further, even if this court were to rely on GR 37 and *Jefferson* in this case (and I maintain that they do not apply), I disagree with the lead opinion's conclusion that "an objective observer could conclude that race was a factor in the State's peremptory challenge to juror 6." Lead opinion at 18-19. Any objective observer could so conclude only if she ignored the facts of this case, which include juror 6's statements as described above. In my view, based on this record, no reasonable person informed by the record could conclude that race played *any* part in the State's peremptory challenge, which, as discussed above, followed and was based on the State's for cause challenge of juror 6. The trial court recognized as much in rejecting the *Batson* challenge and granting the State's peremptory challenge of juror 6. In so doing, the trial court, which is charged with weighing the circumstances and determining whether the challenge was improperly

10

motivated, *see Batson*, 476 U.S. at 97, properly fulfilled its function.[4] There was no error here.[5]

For the reasons noted, and because the State's for cause challenge of juror 76 and its peremptory challenge of juror 6 were properly granted, I would reverse the Court of Appeals, thereby reinstating the defendants' convictions. Accordingly, I dissent.

---

[4] The lead opinion would hold that "exercising a peremptory challenge to remove a juror who does not 'qualify' under death-qualification questioning is a presumptively invalid basis for exercising a peremptory challenge." Lead opinion at 17. As discussed herein, that is not what happened here. As is clear from a fair reading of the record, juror 6 was not "death qualified"; she was challenged for cause and then peremptorily challenged and ultimately excused because she indicated that she did not want the awesome responsibility of judging someone charged with a serious crime. I agree with the trial court that under this record, the peremptory challenge of juror 6 was not improper.

[5] The concurrence would alternatively hold that the trial court abused its discretion by denying defense counsels' motion for a mistrial. The concurrence opined, "It does not matter how the topic [(i.e., mention of the death penalty)] came up; the situation resulted in incurable prejudice, largely due to everyone's attempt to comply with the unfortunate rule in *Townsend*." Concurrence at 2. I disagree. As discussed herein, the trial court appropriately informed the venire as to the jury's proper role in compliance with *Hicks* and *Townsend*, which were controlling precedent at the time. "'A court abuses its discretion only if no reasonable person would take the view adopted by the trial court.'" *State v. Goss*, 186 Wn.2d 372, 383, 378 P.3d 154 (2016) (internal quotation marks omitted) (quoting *State v. Wooten*, 178 Wn.2d 890, 897, 312 P.3d 41 (2013)). Acting in compliance with *Hicks* and *Townsend*, there was no abuse of discretion and no basis for granting a mistrial.

Further, the concurrence's statement that "the situation resulted in incurable prejudice" is no more than a bald assertion. Concurrence at 2. The concurrence fails to identify any such prejudice. As explained herein, the State successfully challenged two potential jurors, one for cause and the other peremptorily, but both challenges were based on the potential jurors' acknowledged inability to act as jurors. *See* VTP (Sept. 23, 2015) at 849, 858, 885 (excusal of juror 76); VTP (Sept. 24, 2015) at 1014, 1016-18, 1020 (excusal of juror 6). Excusing these potential jurors was proper. This record does not demonstrate any prejudice to defendant regarding jury selection. Accordingly, the trial court did not err in denying the defense motion for a mistrial.

11

Madsen, J.

Fairhurst, J.P.T.

Owens, J